In re **LUCENT TECHNOLOGIES, INC. SECURITIES LITIGATION.**

No. 00–cv–621 (JAP).

United States District Court,
D. New Jersey.

June 26, 2002.

David J. Bershad, Jerome M. Congress, Elaine S. Kusel, Patrick L. Rocco, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Max W. Berger, Daniel L. Berger, Steven B. Singer, Jeffrey N. Leibell, Javier Bleichmar, Bernstein, Litowitz, Berger & Grossmann, LLP, New York City, Seth R. Lesser, Bernstein, Litowitz, Berger & Grossmann, LLP, Hackensack, NJ, Co–Lead Counsel for Plaintiffs and the Class.

John H. Schmidt, Jr., Lindabury, McCormick & Estabrook, P.A., Westfield, NJ, Paul C. Saunders, Daniel Slifkin, Cravath, Swaine & Moore, New York City, for Defendants Lucent Technologies, Inc., Richard A. McGinn, Donald K. Peterson, and Deborah C. Hopkins.

## OPINION

PISANO, District Judge.

This is a securities class action on behalf of all parties who purchased the common stock of Lucent Technologies, Inc. ("Lucent" or the "Company") between October 26, 1999, and December 21, 2000 (the "class period"). Before the Court is the motion of Defendants Lucent, Richard A. McGinn, Donald K. Peterson, and Deborah

C. Hopkins'[1] to dismiss Plaintiffs' Fifth Consolidated and Amended Class Action Complaint (the "Fifth Complaint") alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("the Exchange Act"). This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331,- 37 and 15 U.S.C. § 78aa, and resolves this matter under Rule 78 of the Federal Rules of Civil Procedure. For the reasons set forth below, Defendants' motion to dismiss is denied.

## I. The Parties

The Co–Lead Plaintiffs are Teamsters Locals 175 & 505 D & P Pension Trust Fund (the "Pension Trust Fund") and The Parnassus Fund and Parnassus Income Trust/Equity Income Fund. (Fifth Compl. at ¶¶ 1–2.) The Pension Trust Fund is a multi-employer pension trust organized in West Virginia and created under collective bargaining agreements between a number of employers and Teamsters Local Nos. 175 and 505. (Fifth Compl. at ¶ 24.) The Trustees nominated by both employers and the union administer the Pension Trust Fund. (Fifth Compl. at ¶ 24.) Co–Lead Plaintiff Parnassus, which was founded in 1984 and located in San Francisco, has a principal investment objective of long-term growth of capital. (Fifth Compl. at ¶ 25.) It invests solely in companies that practice corporate social responsibility. (Fifth Compl. at ¶ 25.)

Defendant Lucent is a Delaware corporation operating its principal place of business and chief executive offices in Murray Hill, New Jersey. (Fifth Compl. at ¶ 27.)

Lucent designs, builds, and installs a wide range of public and private networks, communications systems, data networking systems, business telephone systems, and microelectronics components, and manufactures integrated circuits and optoelectronic components for the computer and telecommunications industries. (Fifth Compl. at ¶ 27.)

Defendant McGinn was Lucent's President, Chief Executive Officer, and Chairman of its Board of Directors from February 1996 until the Company's Board of Directors discharged him on October 22, 2000. (Fifth Compl. at ¶ 28(a).) McGinn signed the Company's 1999 annual report on Form 10–K (the "1999 10–K"). (*Id.*) During the class period, McGinn was quoted frequently in the news media, in press releases, and in other publicly disseminated materials. (*Id.*) Defendant Peterson was Lucent's Chief Financial Officer and Executive Vice President until March 1, 2000. (*Id.* at ¶ 28(b).) Peterson signed the 1999 10–K. (*Id.*)

Defendant Hopkins joined Lucent as Chief Financial Officer on April 24, 2000. (*Id.* at ¶ 28(c).) Hopkins was responsible for executive management and oversight of all financial operations. (*Id.*) Hopkins issued many of the allegedly misleading statements. (*Id.*)

## II. Procedural History [2]

Between January 7, 2000 and March 2, 2000, eighteen class action complaints were filed against Lucent, McGinn, and Peterson.[3] (Op. & Order dated April 17, 2001

---

**1.** McGinn, Peterson, and Hopkins are collectively referred to as the "Individual Defendants."

**2.** The Court adopts the procedural history from Judge Lechner's letter opinion dated September 27, 2001, which was issued in connection with an order to show cause why

all bids submitted for lead counsel appointment should not be unsealed.

**3.** The complaints filed between January 7, 2000 and March 2, 2000, are collectively referred to as "Lucent I."

("the April 17 2001 Opinion") at 6.) On February 25, 2000 and March 16, 2000, orders were entered consolidating these actions ("Lucent I"). (Order dated Feb. 25, 2000, at 1; Order dated March 16, 2000, at 1.)

By opinion and order dated April 27, 2000 (the "April 27, 2000 Opinion"), the Pension Trust Fund was appointed provisional lead plaintiff in Lucent I. *In re Lucent Techs., Inc. Sec. Litig.*, 194 F.R.D. 137, 158 (D.N.J.2000). After an auction, the firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") was selected as lead counsel. (Op. & Order dated Aug. 2, 2000 (the "Aug. 2, 2000 Opinion"), at 24.)

On November 3, 2000, the Pension Trust Fund filed a Consolidated and Amended Class Action Complaint (the "First Consolidated and Amended Complaint") alleging a class period from October 26, 1999 through January 6, 2000. (First Consol. & Am. Compl. at ¶ 1.)

On November 21, 2000, Lucent issued a press release announcing that it had improperly recognized approximately $125 million in revenues during the fourth quarter of 2000. (April 17, 2001 Op. at 8.) Lucent also announced in this press release that it had reported this revenue recognition issue to the Securities and Exchange Commission ("SEC"). (*Id.* at 8–9.)

Following the November 21, 2000 press release, a number of other class action complaints ("Lucent II") were filed against Lucent, McGinn, Henry B. Schacht, and Deborah C. Hopkins. It appears that the Lucent II actions were filed as a result of this press release. (*Id.*)

On November 22, 2000, the Pension Trust Fund filed a Second and Consolidated and Amended Class Action Complaint (the "Second Complaint"). (*Id.*) The Second Complaint broadened the class period, extending it through October 10, 2000. (Second Compl., ¶ 1.)

On December 1, 2000, the Pension Trust Fund filed a Third Consolidated and Amended Class Action Complaint (the "Third Complaint".) (April 17, 2001 Op. at 9.) The class period alleged in the Third Complaint was further extended to include October 26, 1999 through November 21, 2000. (Third Compl. at ¶ 1.)

On December 21, 2000, Lucent issued a press release announcing that it would reduce fourth quarter 2000 revenues by an additional $700 million. (April 17, 2001 Op. at 9.) Several additional class action complaints were filed following the December 21, 2000 press release (also referred to as "Lucent II"). *Id.*

On January 4, 2001, the Pension Trust Fund filed a Fourth Consolidated and Amended Class Action Complaint (the "Fourth Complaint"). (*Id.* at 10.) The class period alleged in the Fourth Complaint was then extended further to include the period between October 26, 1999 and December 21, 2000. (Fourth Compl. at ¶ 1.)

On December 26, 2000, Judge Alfred J. Lechner, Jr. entered an order consolidating the Lucent II complaints with the Lucent I action (the "December 26, 2001 Consolidation Order.") On January 23, 2001, Defendants Lucent, McGinn, and Peterson filed an answer to the fourth complaint. (April 17, 2000 Op. at 10.)

By letter dated January 4, 2001, counsel for Parnassus Income Trust/Equity Income Fund ("Parnassus") requested that the December 26, 2000 consolidation order be vacated. (First Jan. 4, 2001 Letter at 1.) Likewise, by letter dated January 4, 2001 (the "Second January 4, 2001 Letter"), counsel for the Anchorage Police & Fire Retirement System and the Louisiana School Employees' Retirement System,

also requested that the December 26, 2000 consolidation order be vacated. (Second Jan. 4, 2001 Letter at 1–2.) Collectively, these letters were treated as a motion to vacate the December 26, 2000 consolidation order. (April 17, 2001 Op. At 6.)

After oral argument on March 9, 2001, Judge Lechner denied the motion to vacate. (*Id.* at 48.) Further, since the Court determined that additional representation would benefit the class, it appointed Parnassus to serve as Co–Lead Plaintiff with the Pension Trust Fund. (*Id.* at 39.) An auction was held to select co-lead counsel to serve with Milberg Weiss. (*Id.* at 42.)

By order entered June 13, 2001, the Court appointed the firm of Bernstein Litowitz Berger & Grossman LLP to serve as co-lead counsel. On August 10, 2001, the co-lead plaintiffs filed a Fifth Consolidated and Amended Class Action Complaint ("Fifth Complaint"), which is now the subject of Defendants' motion to dismiss.[4]

## III. Background

For the limited purpose of this motion to dismiss under Rule 12(b)(6), the Court, as it must, accepts as true the facts alleged in the Fifth Complaint and all inferences reasonably drawn from those facts. *See Hayes v. Gross,* 982 F.2d 104, 106 (3d Cir.1992); *see also infra* IV. (**Rule 12(b)(6) Standard.**) Accordingly, the facts recited below are taken from Plaintiffs' Fifth Complaint, and do not represent this Court's factual findings.

Lucent, which spun off from AT & T in 1996, at one time held a dominant position in the telecommunications equipment market. (Fifth Compl. at ¶ 3.) Plaintiffs allege that by mid–1999, however, Lucent had "squandered" its position. (*Id.*) As the telecommunications industry shifted from

transmission of voice to data, new technologies and products developed, and new entrants into the marketplace began to compete with Lucent. (*Id.*) Plaintiffs allege that Lucent misrepresented at all relevant times that it was at the " 'forefront of [this] competition' " and that it expected continued growth. (*Id.*)

At the beginning of the class period, Lucent was suffering severe problems. (Fifth Compl. at ¶ 4.) Plaintiffs claim that Lucent had fallen behind in developing its then "product of choice," specifically, optical networking products capable of running at "OC–192" speed. (*Id.*) It was experiencing widespread problems that resulted in loss of sales and revenues. (*Id.*) Additionally, rampant problems concerning product design, reliability, and timeliness of deliveries throughout Lucent's product lines caused customer dissatisfaction and order cancellations, particularly for Lucent's WaveStar and wireless products. (*Id.*) Further, Lucent developed problems with AT & T, its largest and most important customer. (*Id.*) Lucent became unwilling to manufacture to AT & T's specifications, AT & T expressed its desire to diversify its sources of supply, and Lucent was unable to adequately develop products that met AT & T's requirements. (*Id.*)

By fall 1999, Lucent had met or exceeded analysts' published revenue and earnings expectations for fourteen straight quarters. (Fifth Compl. at ¶ 5.) At the beginning of the class period, Lucent's management acknowledged in internal e-mails that its optical networking group was in " 'serious disrepair' " and that Lucent, as a result, was " 'up against a revenue wall.' " (*Id.*)

---

**4.** The Fifth Complaint does not further expand the class period.

An October 24, 2000 Wall Street Journal article, *Lucent Ousts McGinn as CEO and Chairman,* reports that Lucent senior executives had informed McGinn that Lucent needed to reduce public projections of revenue and earnings because new products were not yet ready for sale while sales of older products had declined. (Fifth Compl. at ¶ 6.) Plaintiffs allege that McGinn failed to heed this instruction, and Lucent, consequently, failed to advise investors of its declining business. (*Id.*)

Plaintiffs allege that Lucent and the Individual Defendants took various steps to conceal from the investing public the Company's true financial situation. (Fifth Compl. at ¶ 7.) They claim that Lucent, among other things, misrepresented actual demand for its optical networking products. (*Id.*) According to Plaintiffs, Lucent failed to disclose that customer demand for optical networking products had decreased even when it was producing at a rate slower than its competitors and discovering persistent technological problems with its products. (*Id.*) As a result, Defendants allegedly knew that potential customers were deserting Lucent, preferring instead competitor companies that were successfully deploying newer OC–192 capable products. (*Id.*)

Faced with a declining product demand, Lucent allegedly inflated its reported sales by shipping unready products. (Fifth Compl. at ¶ 8.) Specifically, in September 1999, Lucent's optical networking head, Harry Bosco, told the Company's directors at a meeting in Nuremberg, Germany that Lucent had a strategy to ship faulty optical networking products before solving their design and technical problems. (*Id.*) Though this decision was intended to increase reported sales, it exacerbated Lucent's existing problem regarding poor product quality and further diminished product acceptance and sales. (*Id.*)

According to Plaintiffs, Lucent's accounting improprieties began during the first quarter of fiscal year 2000 (ended December 31, 1999) and continued throughout the class period. (Fifth Compl. at ¶ 9.) Plaintiffs allege that Lucent's most senior officers knew throughout the class period that: (1) Lucent's accounting practices violated generally accepted accounting principles ("GAAP"); (2) Lucent had improperly booked hundreds of millions of dollars of revenue on sales to customers in situations where customers had not ordered products; (3) Lucent had improperly booked hundreds of millions of dollars of revenue on shipments to distributors even though Lucent's senior officers had specifically granted these distributors the right to ultimately return unsold products; (4) Lucent sales people were routinely entering into " 'side deals' " with distributors to allow them to return the product while improperly reporting these deals as current sales; and (5) Lucent was " 'stuffing' " its distributors with products they did not want, did not need, and had not ordered. (Fifth Compl. at ¶ 9.)

On January 6, 2000, Lucent announced that the Company would miss analysts' earnings estimates for the first quarter of fiscal year 2000. (Fifth Compl. at ¶ 10.) At that time, McGinn allegedly made false assurances regarding the strong demand for the Company's optical networking products, and attributed the principal causes of the shortfall to manufacturing constraints limiting the Company's ability to fulfill customer orders. (*Id.*)

Throughout the spring and summer of 2000, McGinn and Lucent allegedly continued to reassure the investing public of a strong demand for the Company's products. (Fifth Compl. at ¶ 11.) However, at this time Lucent lost all business for its newest optical networking products with

its largest customer, AT & T, and had internally declared a " 'sales crisis.' " (*Id.*) By no later than the end of Lucent's fiscal year 2000 second quarter, which ended March 31, 1999, Lucent's most senior officers had explicitly recognized that " '[a]s the first half of 2000 comes to a close, it is clear that we cannot continue with the current operational model—it just doesn't work.' " (*Id.*) Still, Lucent's reported results for the March quarter met expectations, and its share price was $62.39 on July 17, 2000. (*Id.*)

Yet Lucent's results for the third fiscal quarter of 2000 failed to meet expectations. (Fifth Compl. at ¶ 12.) In a July 20, 2000 press release announcing those results, McGinn informed investors that Lucent's business remained strong, that Lucent's pro forma revenues from continuing operations would grow about 15% for the fourth fiscal quarter of 2000, and that pro forma earnings per share would be roughly in line with revenue growth. (*Id.*) In fact, Plaintiffs claim that McGinn's information was knowingly misleading. (*Id.*) A complaint filed against Lucent in December 2000 by Nina M. Aversano, Lucent's former President, North America— Service Provider Networks, allegedly reveals that McGinn knew then that fourth quarter revenue and earnings projections were unattainable. (*Id.*)

On October 10, 2000, Lucent disclosed information allowing analysts to determine that its optical networking business had actually declined 15% for the quarter and that it was increasing its reserve for uncollectible accounts receivable. (*Id.*) On October 11, 2000, Lucent's share price fell more than $10 per share, closing at $21.19 (*Id.*)

On October 23, 2000, Lucent announced to analysts that fourth quarter revenues of $9.4 billion and pro forma earnings of $0.18 per share would meet expectations. (Fifth Compl. at ¶ 14.) By November 11, 2000, Lucent's share price increased to approximately $24 per share, leaving analysts to conclude that Lucent had begun to take a " 'step in the right direction.' " (*Id.*)

On November 21, 2000, however, Lucent revealed that 2000 fourth quarter results reported on October 23, 2000, materially overstated the Company's results and, thus, that Lucent had missed analysts' expectations for that quarter. (Fifth Compl. at ¶ 15.) Specifically, Lucent stated that an unspecified " 'revenue recognition problem' " had affected approximately $125 million of reported quarterly revenue. (*Id.*) As a result, the Company announced that it would restate its fiscal quarter revenues and that both quarterly and yearly earnings would drop approximately two cents per share. (*Id.*) Lucent share value fell decreased then to $17.63. (*Id.*)

Finally, on December 21, 2000, Lucent disclosed that its November 21, 2000 announcement regarding its revenue recognition problem was inaccurate. (Fifth Compl. at ¶ 16.) In a December 21, 2000 announcement and conference call with analysts, Lucent indicated that it, again, would restate its fiscal fourth quarter revenues by reducing revenue for the quarter by $679 million to $8.7 billion—a figure $700 million less than the quarterly revenues initially reported, and more than $400 million greater than the restatement amount announced on November 21. (*Id.*) The Company also revised its earnings per share for the quarter from $0.18 per share to $0.10 per share. (*Id.*) Additionally, the Company revealed that it would take a $1 billion restructuring charge in late January 2001. (*Id.*)

The December 21, 2000 announcement revealed that Lucent's sales practices were responsible for, among other things, inappropriate recognition of substantial revenues for sales of products later returned as

a result of either a prior agreement or the product's incompleteness. (Fifth Compl. at ¶ 17.) Following this announcement, Moody's Investor Services downgraded Lucent's credit rating, and Lucent share price dipped significantly to $2.19 per share. (Fifth Compl. at ¶ 18.)

In the Fifth Complaint, Plaintiffs plead two claims: (1) Lucent and the Individual Defendants did not reveal their allegedly improper sales and accounting practices, and thus violated Section 10(b) of the Exchange Act by making false and misleading statements and failing to disclose material facts necessary to make legitimately those statements (Count I); and (2) the Individual Defendants, as controlling persons of the Company, caused the Company to engage in its allegedly wrongful conduct and thus violate Section 20(a) of the Exchange Act (Count II).

Defendants have filed this motion to dismiss the Fifth Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They contend that: (1) Plaintiffs' fraud claims arising out of Lucent's reported financial results for the first and second quarters of fiscal year 2000 are untimely; (2) the Fifth Complaint fails to plead with the requisite particularity that Lucent's third quarter fiscal 2000 financial results were intentionally false and misleading; (3) Plaintiffs' claims relating to Lucent's unaudited financial results for the fourth fiscal quarter 2000 fail to plead scienter; and (4) the Fifth Complaint fails to state a cognizable claim for relief arising from Defendants' other allegedly fraudulent public statements made between October 26, 1999 and October 10, 2000.

## IV. Rule 12(b)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) permits a court to dismiss a complaint that fails "to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, a court accepts as true all of the factual allegations within the complaint and any reasonable inferences that may be drawn from them. *Hayes v. Gross*, 982 F.2d 104, 106 (3d Cir.1992). Claims should be dismissed under Rule 12(b)(6) where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Though a court must take as true all facts alleged, it may not "assume that the [plaintiff] can prove any facts that it has not alleged." *Associated Gen. Contractors of Calif., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Further, on a 12(b)(6) motion, a court shall properly reject any "conclusory recitations of law" pled within the complaint. *Commonwealth of Pennsylvania v. PepsiCo, Inc.*, 836 F.2d 173, 179 (3d Cir.1988); *see Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997) (noting that "a court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss").

Accordingly, a district court reviewing the sufficiency of a complaint has a limited role. In performing that role, the court determines not "whether the plaintiffs will ultimately prevail," but "whether they are entitled to offer evidence to support their claims." *Langford v. Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000); *see also In re Burlington Coat Factory Sec. Litig.* ("*Burlington Coat*"), 114 F.3d 1410, 1420 (3d Cir.1997); *Syncsort Inc. v. Sequential Software, Inc.*, 50 F.Supp.2d 318, 325 (D.N.J.1999); *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 922 (D.N.J.1998). Generally, the court's task requires it to disregard any material beyond the pleadings. *Burlington Coat*, 114 F.3d at 1426; *Pension Benefit Guar. Corp. v. White Con-*

*sol. Indus.,* 998 F.2d 1192, 1196 (3d Cir. 1993).

A district court may, however, consider the factual allegations within other documents, including those described or identified in the complaint and matters of public record, if the plaintiff's claims are based upon those documents. *Burlington Coat,* 114 F.3d at 1426; *In re Westinghouse Sec. Litig. ("Westinghouse"),* 90 F.3d 696, 707 (3d Cir.1996); *In re Donald Trump Sec. Litig.,* 7 F.3d 357, 368 n. 9 (3d Cir.1993); *Pension Benefit Guar. Corp.,* 998 F.2d at 1196. In other words, the court may review those such documents that are "integral to or explicitly relied upon in the complaint," *Burlington Coat,* 114 F.3d at 1426 (citation and quotations omitted), so as to avoid

> [t]he situation in which a plaintiff is able to maintain a claim of fraud by extracting an isolated statement from a document and placing it in the complaint, even though if the statement were examined in the full context of the document, it would be clear that the statement was not fraudulent.

*Id.* Yet just because the court elects under these circumstances to examine documents outside of the complaint does not mean that it need treat the motion as one for summary judgment. *Burlington Coat,* 114 F.3d at 1426; *Pension Benefit Guar. Corp.,* 998 F.2d at 1196–97.

In moving to dismiss under 12(b)(6), Defendants contend that the applicable statute of limitations bars certain § 10(b) claims raised within the Fifth Complaint. They alternatively contend that Lucent's allegations either fail to state a cognizable claim under 10(b)(5) or to satisfy the Private Securities Litigation Reform Act's ("PSLRA") pleading requirements.

## V. Statute of Limitations

Defendants claim that the Fifth Complaint alleges for the first time in this litigation that Lucent's reported financial results for the first and second quarters of fiscal year 2000 were false and misleading. (Fifth Compl. at ¶¶ 254(a) & (g).) They argue that these new claims are time-barred because Plaintiffs had timely inquiry notice and that relation-back principles under Rule 15(c) of the Federal Rules of Civil Procedure do not save those claims. (Defs.' br. at 10–14.) Plaintiffs oppose, contending that they sufficiently pled accounting fraud claims for those periods in the Third Consolidated and Supplemental Class Action Complaint. (Pls.' br. at 26–27), and that any new allegations involving "financial and accounting manipulations" relate back to that timely pleading.

 To be timely, claims brought under § 10(b) or Rule 10b–5 must be filed "within one year after the discovery of the facts constituting the violation and within three years after such violation." *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 364, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Inquiry notice is the standard for determining when the one-year limit begins to run. *In re Campbell Soup Co. Sec. Litig. ("Campbell Soup"),* 145 F.Supp.2d 574, 600 (D.N.J. 2001); *In re Prudential Ins. Co. of Am. Sales Practices Litig. ("Prudential"),* 975 F.Supp. 584, 599 (D.N.J.1996). This means that the limitations period commences when the plaintiff " 'should have discovered the general fraudulent scheme.' " *Prudential,* 975 F.Supp. at 599 (quoting *McCoy v. Goldberg,* 748 F.Supp. 146, 158 (S.D.N.Y.1990)). Where a plaintiff makes a reasonably diligent investigation to discover, courts apply a two-part inquiry before fixing the limitations period. *Campbell Soup,* 145 F.Supp.2d at 601 (citing *Rothman v. Gregor,* 220 F.3d 81 (2d

Cir.2000)). First, a court must decide when a plaintiff's duty to investigate arose; that is, a court shall find that a duty is triggered "'when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded.'" *Id.* (citing *Rothman,* 220 F.3d at 96 (quoting *Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993))). Second, a court "'must further determine . . . when knowledge of the facts constituting the violation of section 10(b) and Rule 10b–5 will be imputed if, after the duty to inquire arises, the investor does indeed inquire.'" *Id.* (quoting *Rothman,* 220 F.3d at 97). Though inquiry notice in some cases is decided as a matter of law, *Campbell Soup,* 145 F.Supp.2d at 602 (citing *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98 civ. 4318, 2000 WL 10211, at *3 (S.D.N.Y. Jan.6, 2000)), "it is inappropriate to dismiss claims as time-barred where . . . the analysis is so fact-intensive." *Campbell Soup,* 145 F.Supp.2d at 602 (citations omitted). Put another way, "[w]hether a plaintiff had sufficient facts to place him on inquiry notice of a claim for securities fraud under S.E.C. Rule 10b–5 is a question of fact, and such is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6)." *Marks v. CDW Comp. Centers, Inc.,* 122 F.3d 363, 367 (7th Cir.1997) (citations omitted); *see In re MobileMedia Sec. Litig.,* 28 F.Supp.2d 901, 941 (D.N.J.1998) (noting that "[d]ismissal pursuant to Rule 12(b)(6) based upon the running of the statute of limitations is often inappropriate." (citation omitted)); *Salinger v. Projectavision, Inc.,* 972 F.Supp. 222, 229 (S.D.N.Y.1997) ("The question of constructive knowledge and inquiry notice may be one for the trier of fact and therefore ill-suited for determination on a motion to dismiss.") (citations omitted).

In support of their argument, Defendants claim that Plaintiffs had made suffi-cient inquiry by June 2, 2000, the date of Milberg Weiss' sealed bid in support of its motion to be appointed lead counsel, and were then on notice that Lucent's reported revenue for the first two quarters of fiscal year 2000 might have been false and misleading. (Defs.' br. at 11.) Plaintiffs do not address the inquiry notice issue in their opposition. (Pls. br. at 25–29.)

A finding that Plaintiffs were on inquiry notice as of no later than June 2000 requires the Court to conclude that Plaintiffs then possessed all information needed to sufficiently plead their 10(b)(5) claims relevant to the first two quarters in 2000. From the face of the Fifth Complaint, the Court can not fairly reach that conclusion. Because the Court can not resolve this issue without making factual findings, the Court declines to dismiss Plaintiffs' claims regarding the first two quarters of fiscal 2000 as untimely. The requisite analysis of this issue is appropriate for a later stage in this litigation. Accordingly, the Court shifts its focus to the viability of Plaintiffs' 10(b) claims under the heightened pleadings standards.

## VI. Section 10(b) Claim

■ Section 10(b) and Rule 10b–5 apply to "false or misleading statements or omissions of material fact that affect trading on the secondary market." *Burlington Coat,* 114 F.3d 1410, 1417 (3d Cir.1997); *Campbell Soup Co.,* 145 F.Supp.2d at 583 (D.N.J.2001) (quoting *Burlington* for same proposition). Section 10(b) bans the "use or employ[ment], in connection with the purchase or sale of any security, . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b). Applicable to section 10(b), Rule 10b–5 makes it illegal "[t]o make any untrue statement of a material fact or to omit to state a materi-

al fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading ... in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5(b); *see Campbell Soup*, 145 F.Supp.2d at 583.

■ A plaintiff must plead five elements to demonstrate a claim under Section 10(b) and Rule 10b–5: (1) defendant made a representation or omission of material fact; (2) scienter motivated defendant's representation or omission; (3) defendant made that representation or omission in the context of a securities purchase or sale; (4) plaintiff relied on defendant's representation or omission; and (5) plaintiff's reliance proximately caused damages. *E.g., EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 871 (3d Cir.2000) (citing *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 315 (3d Cir.1997)); *In re Advanta Corp. Sec. Litig.* *("Advanta")*, 180 F.3d 525, 537 (3d Cir. 1999) (citing *Westinghouse*, 90 F.3d 696, 710 (3d Cir.1996)).

■ A defendant can not be held liable for failure to disclose unless plaintiff first demonstrates that defendant, indeed, had a duty to disclose. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n. 17, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b–5."); *Campbell Soup*, 145 F.Supp.2d at 583 (citing *Basic* as support). But once a defendant makes a disclosure, that defendant must ensure that any disclosure is accurate. *Campbell Soup*, 145 F.Supp.2d at 583 (citation omitted). In Section 10(b) and Rule 10b–5 actions, "[a] statement is false or misleading if it is factually inaccurate, or additional information is required to clarify it." *In re Nice Sys., Ltd. Sec. Litig. ("Nice Sys.")*, 135 F.Supp.2d 551, 573 (D.N.J.2001) (citations and quotations omitted); *Campbell Soup*, 145 F.Supp.2d at 583.

■ Not just any false or misleading statement gives rise to liability; instead, only a material representation or omission is actionable. *Basic*, 485 U.S. at 238, 108 S.Ct. 978; *Campbell Soup*, 145 F.Supp.2d at 583 (citing *Basic*). Material information in the context of a 10(b)(5) case is "information that would be important to a reasonable investor in making his or her investment decisions." *Burlington Coat*, 114 F.3d at 1425; *Campbell Soup*, 145 F.Supp.2d at 583–84 (quoting *Burlington Coat*, 114 F.3d at 1425). "Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see Campbell Soup*, 145 F.Supp.2d at 584 (quoting *TSC Indus., Inc.*, 426 U.S. at 449, 96 S.Ct. 2126) (citation omitted). A material representation is different from both a subjective statement, including one expressing an opinion, motive, or intent, and a generally optimistic statement, otherwise known as "puffery." *Campbell Soup*, 145 F.Supp.2d at 584 (quotations and citations omitted). Reasonable investors interpret puffery as merely that and nothing more. *Id.* (quoting *EP Medsystems*, 235 F.3d at 872 (quoting *Advanta*, 180 F.3d at 538)).

■ An alternative standard exists for determining materiality in the context of an "efficient" market. *Burlington Coat*, 114 F.3d. at 1425; *Campbell Soup*, 145 F.Supp.2d at 584 (citations omitted). Since "efficient markets are those in which information important to reasonable investors ... is immediately incorporated into stock prices," it necessarily follows that "the concept of materiality translates into information that alters the price of the

firm's stock." *Burlington Coat,* 114 F.3d at 1425 (citations omitted); *Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Burlington Coat* for this proposition). "As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock." *Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir. 2000)).

### VII. Pleading Requirements—Rule 9(b) and the Private Securities Litigation Reform Act (the "Reform Act")

#### 1. Rule 9(b)

Since Section 10(b) and Rule 10b–5 claims assert "fraud," a plaintiff alleging "false or misleading statements or omissions of material fact" must meet the heightened pleading requirements of both Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). 15 U.S.C. § 78u–4 *et seq.; Oran,* 226 F.3d at 288; *Advanta,* 180 F.3d at 530; *Campbell Soup,* 145 F.Supp.2d at 584 (citations omitted).

■ An exacting standard, Rule 9(b) prescribes that "[i]n all averments of fraud or mistake, the circumstances constituting the fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). This heightened pleading requirement gives "defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *Burlington Coat,* 114 F.3d at 1418; *see Campbell Soup,* 145 F.Supp.2d at 584 (quoting *Burlington Coat* for this proposition).

■ So as to prevent defrauding parties from concealing fraudulent behavior, however, the ordinarily strict particularity standard is less rigorous "where the factual information is peculiarly within the defendant's knowledge or control." *Campbell Soup,* 145 F.Supp.2d at 584 (quotations and citations omitted). Still, even when relaxed, the Rule 9(b) standard does not tolerate mere boilerplate and conclusory allegations. A plaintiff must offer factual allegations that plausibly support the asserted legal theories within the complaint. *Id.* (quoting *Burlington Coat,* 114 F.3d at 1418) (citations and italics omitted).

#### 2. Private Securities Litigation Reform Act

■ Reacting to conflict among the circuits concerning the appropriate pleading standard and to "an increasing number of frivolous 'strike suits' aimed at achieving quick settlements," Congress enacted the Reform Act in 1995 to add to the Rule 9(b) standard a " 'uniform and stringent pleading requirement.' " *Campbell Soup,* 145 F.Supp.2d at 584–85 (quoting S.Rep. No. 104–98, at 15 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 694). Under that Act, a complaint alleging Section 10(b) violations is insufficient unless it " 'specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading and, if an allegation regarding the statement or omission is made on information and belief, ... state[s] with particularity all facts on which that belief is formed.' " *Campbell Soup,* 145 F.Supp.2d at 585 (quoting 15 U.S.C. § 78u–4(b)(1)); *see Advanta,* 180 F.3d at 530 (reciting this same standard). Thus, a court must examine carefully all fraud allegations in the complaint, reviewing each allegation separately. *Westinghouse,* 90 F.3d at 712;

*Campbell Soup,* 145 F.Supp.2d at 585 (citing *Westinghouse* for this proposition).

### 3. Scienter

 Section 10(b) allegations must meet the strict pleading requirements of Rule 9(b). *Advanta,* 180 F.3d at 532. The requisite "strong inference" of fraud "may be established either (a) by alleging facts to show that the defendant had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."[5] *Id.* at 534. Supplementing Rule 9(b), the Reform Act requires a plaintiff, "with respect to *each* act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that ... [each] defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). This requirement is not, to put it mildly, lightly regarded in securities fraud cases. *Oran,* 226 F.3d at 288.

## VIII. Alleged Materially False and Misleading Statements

Plaintiffs assert that each of the following press releases, SEC filings, and statements is materially false and misleading.

### a. *October 26, 1999 press release*

In a press release dated October 26, 1999, Lucent announced the Company's fourth quarter operating results, quoting statements from McGinn:

"Our ability to provide customers with the systems, software, silicon and services they need to build end-to-end next-generation networks continues to win Lucent new business and strengthen our relationships with existing customers," said McGinn. In fiscal 1999, Lucent announced more than $11 billion in contract wins, including more than $2 billion in September alone. McGinn noted that Lucent's growth in the fourth quarter was again driven by the company's focus on hot growth areas like optical networking, wireless networking and professional services.

(Fifth Compl. at ¶ 218.) Plaintiffs allege that these statements were materially false and misleading because the Company was, in fact, "desperately playing catch up in optical networking, and had serious manufacturing, supply, cost, and quality assurance problems that impaired its ability to produce and perform." (*Id.* at ¶ 218(a).) They further allege that demand had shifted dramatically away from Lucent's existing optical networking product to OC–192, *Id.* at ¶ 64, and that customers were shifting their purchases to companies like Nortel, which could already sell OC–192 product, or were deferring purchases from Lucent until Lucent would be able to sell OC–192, *id.* at ¶¶ 64–68. (*Id.* at ¶ 218(a).) Plaintiffs assert also that demand had significantly diminished for the OC–48 optical networking product that Lucent was then able to sell, *id.* at ¶¶ 65–66. (*Id.* at ¶ 218(a).) Citing an article published in The Wall Street Journal on October 24, 2000, Plaintiffs argue that senior Lucent Executives had told McGinn as early as October 1999, that Lucent needed to drastically cut its financial projections because the Company's newest products

---

5. "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Advanta,* 180 F.3d at 535 (quoting *McLean v. Alexander,* 599 F.2d 1190, 1197 (3d Cir.1979) (quoting *Sundstrand Corp. v. Sun Chem. Corp.,* 553 F.2d 1033, 1045 (7th Cir. 1977))). "Conscious behavior" generally requires "intentional fraud or other deliberate illegal behavior." *Advanta,* 180 F.3d at 535.

were not ready for sale, and sales of older ones would decline. (*Id.* at ¶ 218(a).) In fact, Lucent's optical networking group ("ONG") products were not directed at "'hot growth areas.'" (*Id.* at ¶¶ 64–68, 218(b).) Also, Lucent's relationships with existing customers were deteriorating, *id.* at ¶¶ 95–99, and its optical networking products did not work, *id.* at ¶¶ 100–04. (*Id.* at ¶ 218(g).) Lucent also could not "'provide customers with the systems, software, silicon and services ... which were continuing to win Lucent new business,'" *id.* at ¶¶ 73–87, and was touting "contracts wins" that were actual losses, *id.* at ¶¶ 65, 96–99. (*Id.* at ¶ 218(e)-(f).) Allegedly, Lucent recognized hundreds of millions of dollars of revenue in the first quarter on products that had not yet been sold to report revenue at levels the Company previously told the market to expect. (*Id.* at ¶ 218(g) (citing *id.* at ¶¶ 36, 115–19, 122–26.))

### b. October 26, 1999 Bloomberg Forum conference call

In an October 26, 1999 *Bloomberg Forum* conference call discussing Lucent's results, McGinn stated to analysts: "'We are experiencing exceptionally strong growth in data networking for service providers, in wireless networks, [and] in optical networking ...'" McGinn was asked "'whether optical networking was growing—you know people are saying the market is growing at 40 to 50% a year, are you in that range?'" In response, McGinn stated: "'I can tell you that you're right, that Optical is growing 40 to 50% and we're exactly the same range even though we are the leader.'" Plaintiffs' claim that these statements were materially false and misleading when made because Lucent could not grow its optical business in the range of 40–50%. (*Id.* at ¶¶ 74–76, 219(a)). Rather, Lucent was not "the leader" in optical networking, but rather a "quickly eroding second to Nortel." (*Id.* at ¶ 219(a)-(b) (citing *id.* at ¶¶ 64–68.)) The market price of Lucent stock rose from a market price of $59.00 immediately before the Company's October 26 announcement to over $80.62 per share by November 18, 1999. (*Id.* at ¶ 220.) The stock price reached its high of over $84.00 per share on December 9, 1999. (*Id.*)

### c. November 11, 1999 annual meeting with market analysts

In its November 11, 1999 annual meeting with market analysts, as reported in a November 12, 1999 Legg Mason Wood Walker Inc. report, "'management reiterated its 2000 guidance of 17% to 19% top line growth and earnings growth in excess of that rate.'" According to this report, management stated further that optical networking was an "'area in which Lucent has the leadership position in a market and that have growth rates of at least 20%.'" (*Id.* at ¶ 221.) These statements were allegedly false. In fact, as reported in The Wall Street Journal on October 24, 2000, McGinn had been informed by Lucent senior executives that Lucent needed to drastically cut financial projections because its newest products were not ready yet, and sales of older products were going to decline. (*Id.* at ¶¶ 74, 100–04.) Also, Lucent senior management knew that Lucent's recorded revenues materially overstated sales because the Company engaged in a widespread practice of recording revenue before sales were completed. (*Id.* at ¶¶ 114–37.)

### d. January 6, 2000 press release

In a January 6, 2000 press release, Lucent announced that first fiscal quarter of 2000 results would fall short of analysts' expectations. (*Id.* at ¶ 223.) Lucent would report quarterly earnings between $0.36 to $0.39 per share and yearly earn-

ings of $1.44 to $1.50 per share. Analysts, however, had estimated quarterly earnings of $0.54 per share and yearly earnings of $1.53. (*Id.*). Lucent attributed these results to several factors including:

—Faster than anticipated shifts in customers' purchases to Lucent's newest 80–channel DWDM optical product line and greater than expected demand for OC–192 capability on the 80–channel systems, which resulted in near-term manufacturing capacity and deployment constraints;

—Changes in implementation plans by a number of customers inside and outside the United States, which led to delays in network deployments by enterprises and service providers;

—Lower software revenues, reflecting an acceleration in the continuing trend by service providers to acquire software more evenly throughout the year. In the past, these purchases occurred primarily in the quarter ending December 31; and

—Preliminary results show lower than anticipated gross margins this quarter from ramp-up costs associated with introducing and implementing new products and lower software revenues.

(*Id.* at ¶ 223.) Lucent's explanations for the shortfall were allegedly false and misleading when made because:

(a) It was materially false and misleading to say that the shift in customer demand to OC–192 was "'faster'" or "'greater'" than anticipated because Lucent was seriously behind the competition in this area, and that potential customers were refusing to buy 2.5 gigabit products and shifting their purchases to competitors who were selling OC–192 (*Id.* at ¶¶ 64–68);

(b) Lucent's former customers were not shifting their purchases to Lucent's new DWDM OC–192 product, but instead were buying products from Lucent's competitors, including Nortel, NEC, Ciena and Cisco, because, among other reasons, the launch of Lucent's OC–192 product continued to be delayed and the product was still being tested (*Id.* at ¶¶ 64–68);

(c) Lucent was not experiencing "'near-term manufacturing capacity and deployment constraints.'" (*Id.* at ¶¶ 100–04).

(d) Lucent's lower revenues were in part the result of Lucent's sales representatives having previously stuffed the channels with unwanted merchandise, as described in the March 8 and 9, 2000 "'side deal'" emails (*Id.* at ¶¶ 128–29) and in interviews with former Lucent Employees (*Id.* at ¶¶ 130–33), reducing Lucent's ability to perform currently at the levels wrongfully projected by management;

(d) Lucent's lower revenues were in part the result of Lucent's sales representatives having previously stuffed the channels with unwanted merchandise ... (*Id.* at ¶¶ 128–29, 130–33.)

(e) Many of the sales of optical networking products that Lucent recorded should not have been recognized because they were the result of Lucent aggressively offering discounts and loans to potential customers of questionable creditworthiness who could not pay (*Id.* at ¶¶ 138–46, ¶¶ 172–86.)

(f) Lucent failed to obtain expected revenues from the lost contracts and certain divisions described above. (*Id.* at ¶ 108.)

(*Id.* at ¶ 223.)

*e. January 7, 2000 conference call*

During a January 7, 2000 conference call hosted by Bloomberg News Reporter Eric Schatker, McGinn again sought to reas-

sure the market as to the demand for Lucent products by stating that Lucent encountered optical production problems because it had "'not fully anticipated'" demand. (*Id.* at ¶ 224.) McGinn also stated that "'it is an execution issue for us.'" Later during the call, he reiterated that the optical problems resulted from Lucent's lack of "'capacity to meet that need.'" Plaintiffs assert that these statements were allegedly false and misleading because Lucent was not enjoying the strong demand it represented to have at that time. (*Id.* at ¶ 223.)

### f. January 30, 2000 press release

In a January 30, 2000 press release, Lucent announced first quarter financial results, specifically, $9.9 billion in revenues and $0.38 in net income per share. Plaintiffs allege that these financial results were materially false and misleading because:

(a) Lucent improperly recognized almost $300 million of revenue in the first quarter on products that had not yet been sold (*Id.* at ¶¶ 115–19, 136);

(b) Lucent improperly recognized millions of dollars of revenue even though the Company's sales representatives made "'side deals'" to permit customers and distributors to return the product in a later period if it was not sold (*Id.* at ¶¶ 128–29, 134);

(c) Lucent improperly recognized many millions of dollars of revenue where collections were questionable (*Id.* at ¶¶ 177–86).

(*Id.* at ¶ 225.)

### g. Form 10–Q for the first quarter of 2000

In its Form 10–Q for the first quarter of 2000, Lucent reported, among other things, revenues of $9.9 billion and net earnings per share of $0.38. (*Id.* at ¶ 226.) Additionally, Note 1 to the Form 10–Q, which is entitled "Basis of Presentation," Lucent states that:

> The accompanying unaudited consolidated financial statements have been prepared ... pursuant to the rules and regulations of the Securities and Exchange Commission and, in the opinion of management, include all adjustments necessary for a fair presentation of the results of operations, financial position and cash flows for each period shown.

Plaintiffs assert that the financial results were materially false and misleading when made and, further, that Lucent's "Basis of Presentation" representation was materially false. (*Id.* at ¶ 225.)

### h. The New Jersey Star Ledger's February 17, 2000 report on annual shareholder meeting

In an article dated February 17, 2000, The New Jersey Star Ledger reported that at the annual shareholder meeting McGinn characterized the Company's optical problems as the result of Lucent's failure to anticipate a rapid customer shift to the newest generation of fiber optic products. (*Id.* at ¶ 227.) According to the article, McGinn told reporters after the meeting that Lucent's first quarter problems were not indicative of a decreased demand because demand "'remained robust and w[ould] enable Lucent to regain its momentum swiftly.'" (*Id.* at ¶ 227.) McGinn reiterated his forecast that Lucent would post full year revenue gains of 17% and per share earnings growth of 20–25%.

Plaintiffs allege that all statements concerning demand were false and misleading because Lucent was then suffering diminishing demand for optical networking products due to product failure. (*Id.* at ¶ 227 (citing *id.* at ¶¶ 64–65.)) They further allege that McGinn possessed actual knowledge that his statements forecasting fall revenue gains of 17% and per share

earnings of 20–25% were false because McGinn allegedly knew that Lucent had severe problems throughout its optical networking, wireless, switching and software product lines. (*Id.* at ¶ 228 (citing ¶¶ 74, 64–68, 96, 100–04, 108, 110, 128–29, 130–33.))

### i. April 19, 2000 press release

In an April 19, 2000 press release, Lucent announced financial results for its second fiscal quarter of 2000, particularly, $10.3 billion revenues and $0.23 net income per share. (*Id.* at ¶ 229.) Additionally, McGinn commented that, " 'Lucent is regaining its momentum this quarter with strong growth in wireless, Internet infrastructure—including optical and data networking systems and optical fiber—professional services and optoelectronics.' " McGinn also noted that revenues for both wireless and service provider Internet infrastructure had increased by more than fifty percent. (*Id.*)

Plaintiffs allege that these financial results and other statements were materially false because:

(a) Lucent improperly recognized hundreds of millions of dollars of revenue in the second quarter on products that had not yet been sold (*Id.* at ¶ 136.)

(b) Lucent improperly recognized many millions of dollars of revenue even though the Company's sales representatives made " 'side deals' " to permit customers and distributors to return the product in a later period if it was not sold by then. (*Id.* at ¶¶ 121, 128–29.)

(c) Lucent improperly recognized millions of dollars of revenue where collections were questionable as a result both of aggressively offering discounts and loans to potential customers of questionable creditworthiness who could not pay. (*Id.* at ¶¶ 138–46, 172, 176.)

(d) Lucent improperly recognized millions of dollars of revenue on software pools, like the $10 million deal made with BellSouth (*Id.* at ¶ 196.)

### j. Form 10–Q for the second quarter of 2000

In its second quarter 2000 Form 10–Q, Lucent reported, among other things, $10.3 billion in revenues and $0.23 in net earnings per share. The "Basis of Presentation" set forth in Note 1 of the 10–Q reads:

> The accompanying unaudited consolidated financial statements have been prepared pursuant to the rules and regulations of the Securities and Exchange Commission and, in the opinion of management, include all adjustments necessary for a fair presentation of the results of operations, financial position and cash flows for each period shown.

(*Id.* at ¶ 230.) Plaintiffs claim that the reported results and Note 1 were materially false and misleading when made. (*Id.* at ¶ 230.)

### k. May 15, 2000 news article on multi-channel news service

In a May 15, 2000 news article, Lucent announced that it would sell $6 billion of optical networking gear in 2000, up from $4 billion in 1999. (*Id.* at ¶ 231.) The article also indicated that Optical Division Head Kathy Szelag characterized the demand for Lucent's optical products as " 'unprecedented.' " (*Id.* at ¶ 231.) She further stated that problems affecting the ONG unit in its first fiscal quarter—component shortages and a lack of deployment personnel—had been resolved. (*Id.*)

Plaintiffs assert that these statements were materially false and misleading because actual demand for Lucent's optical networking products was declining because it was having problems developing and

deploying a working optical networking system. (*Id.* at ¶ 231 (citing ¶¶ 64–68.))

### l. July 20, 2000 Press Release

In its July 20, 2000 press release, Lucent announced its third fiscal quarter results, touting that " 'Revenues from Lucent's pro forma continuing operations [were] up 20% and pro forma earnings per share rose 30%.' " (*Id.* at ¶ 232.) Lucent also represented that its OC–192 optical systems had received " 'strong customer acceptance.' " (*Id.*) Despite these representations, Lucent reported quarterly results suffered a net loss of $301 million, or $0.09 a share, but attributed this loss to charges arising from recent acquisitions. (*Id.*)

Plaintiffs allege that these financial results and accompanying statements were materially false when made because:

(a) Lucent improperly recognized hundreds of millions of dollars of revenue even though the Company's sales representatives made "side deals" to permit customers and distributors, including Anixter and Graybar, to return the product in a later period if it was not sold. (*Id.* at ¶¶ 127–37);

(b) Lucent improperly recognized millions of dollars of revenue where collections were questionable as a result both of aggressively offering discounts and loans to potential customers of questionable creditworthiness who could not pay. (*Id.* at ¶¶ 138–46, 172–86, 176);

(c) Lucent improperly recognized millions of dollars of revenue on software pools, like the $10 million deal made with BellSouth. (*Id.* at ¶ 196);

(d) Lucent's OC–192 optical systems were not seeing "strong customer acceptance." (*Id.* at ¶¶ 99, 155. 162, 168)

(*Id.* at ¶ 232.)

The July 20 press release also offered investors guidance for the fourth fiscal quarter of 2000. (*Id.* at 233.) Quoting McGinn, the release indicates that, " 'Lucent expects that pro forma revenues from continuing operations will grow about 15% for the fourth fiscal quarter of 2000, which ends Sept. 30, 2000, and pro forma earnings per share from continuing operations will be roughly in line with revenue growth.' " (*Id.*) According to Plaintiffs, this guidance was false, and cannot be construed as a matter of law as a "forward-looking" statement. (*Id.* at ¶ 233.) In arguing this, Plaintiffs claim that Lucent's disclaimer does not warn of risks of similar significance to the risk actually realized, and does not reference any particular publicly-filed document that discloses such risks. (*Id.*) Moreover, Plaintiffs allege that the statements concerning Lucent's fourth quarter revenues and earnings were made by and with the approval of McGinn, " 'who knew that Lucent's business during the fourth quarter was continuing to deteriorate, and that fourth quarter revenue guidance was unattainable.' " (*Id.* at ¶ 234 (citing ¶¶ 99, 155,156, 158, 161–63, 168.))

### m. July 20, 2000 conference call— statements made by McGinn & Hopkins

During a July 20, 2000 conference call with analysts, McGinn repeated his earlier guidance: " 'We expect to have top line growth with the current quarter ending September 30th at 15% with bottom line growth roughly in line with that.' " (*Id.* at ¶ 236.) McGinn also represented:

Deb Hopkins and I personally did a comprehensive operations review of each of our businesses and we are confident in the [numbers] we are giving you today. When we did this review we found it [sic] fundamentals to the business are solid. The market is strong and there is

tremendous customer acceptance of our products and our services. In fact, we have a[sic] demand of exceeded capacity of broad band access products in lOG optical systems, fiber Optics and other electronic devices.

\* \* \*

As we said we would we shipped to 250 million dollars plus [of the 10G optical product] during the 3rd fiscal quarter just ended. And, as we have advised we expect to triple that ramp up to 750 million dollars in Q4. We are confirming that—that ramp continues but by definition, we have had to sell this to our customers at market prices before full volume production has been achieved despite tripling the manufacturing capacity and optical component shortages and lengthy customer certification process [sic] has spread the ramp up to full volume over the next two quarters but customer acceptance is very, very, good.

(*Id.* at ¶ 236.)

During this same conference call, Hopkins represented that optical networking products, particularly new products, continued to generate sales:

Today we reported that pro forma net income from continuing operations for the 3rd fiscal quarter rose 3.4 % to 30 cents a share. We had strong revenue growth in key areas. Leading the way our data networking for service providers grew nearly 60% quarter over quarter with particularly strong sales of our access products. Our optical business, including the optical fiber business that will stay [with Lucent] grew 27% ... The good news is that increasingly our revenues are coming from newer products and high growth markets such as broad band.

(*Id.* at ¶ 237.) Hopkins also specifically addressed her role in Lucent's customer financing:

Since coming on board, I have been studying Lucent's customer financing program in detail. As with any program or process service there are some areas that could be improved ... I must tell you that I am finding and it has been verified by independent sources that Lucent's programs do not vary significantly from our competitors from the types of risks we take and the way we structure our transactions.

(*Id.* at ¶ 237.)

Plaintiffs allege that statements made during the July 20, 2000 conference call were false and misleading. (*Id.* at 238–41; *see id.* at 232–33.)

### n. Form 10–Q Report for the third quarter of 2000

In its Form 10–Q for the third quarter of 2000, Lucent reported, among other things, $8.7 billion in revenues and $0.09 in net earnings per share. In addition, in Note 1 to the consolidated financial statements, entitled "Basis of Presentation," the Company stated that:

The accompanying unaudited consolidated financial statements have been prepared ... pursuant to the rules and regulations of the Securities and Exchange Commission and, in the opinion of management, include all adjustments necessary for a fair presentation of the results of operations, financial position and cash flows for each period shown.

(*Id.* at ¶ 243.) Plaintiffs allege that the financial results and the "Basis of Presentation" were materially false and misleading when made. (*Id.* at ¶ 243 (citing *id.* at 232–33.))

### o. October 10, 2000 press release

In its October 10, 2000 press release entitled, *"Lucent Technologies Comments On Expectations For Fourth Fiscal Quar-*

*ter 2000 Earnings,*" Lucent informed that it expected lower fourth quarter earnings than were announced on July 20, proffering three reasons:

—Less than expected revenues and gross margins in the company's optical systems business;

—Credit concerns in the emerging service provider market that led to increasing reserves for bad debt;

—Greater than anticipated decline in circuit switching sales and margins.

(*Id.* at ¶ 244.) During a conference call after results were released, McGinn stated that:

[the] earnings shortfall resulted from 3 primary factors, all roughly equivalent. First, we saw less than expected revenues in gross margins in our optical business. Then again [,] we saw credit concerns about the ability of emerging service providers to meet their financial obligations. While the market looks good for the long term, the risk in the current environment led us to increase reserves for bad debt. Third, we saw a greater than anticipated decline in circuit switching sale and margins. As a result our gross margins will be about 39% to 40% for this quarter. . . .

(*Id.* at ¶ 244.) Yet, as Plaintiffs allege, Lucent had still not disclosed that its previously reported financial results for the first three quarters, and those anticipated for its fourth quarter, were overstated. Plaintiffs claim that the inflated results reflect inappropriate accounting practices, *id.* at ¶¶ 138–46, using software pools, *id.* at ¶¶ 187–96, "stuffing product" into the distribution channels, *id.* at ¶¶ 127–37, 197–215, and making side deals entitling customers and distributors to return Lucent's products, *id.* at ¶¶ 127–37, 197–215. (*Id.* at ¶ 244.)

p. *October 23, 2000 Form 8–K*

In its Form 8–K filed on October 23, 2000, Lucent reported that pro forma revenues for the fourth fiscal quarter, which ended September 30, 2000, increased 14.6% to $9.4 billion, while earnings per share from continuing operations were $0.18 per share, or $600 million. (*Id.* at ¶ 247.) Additionally, the Form 8–K reported that Hopkins gave guidance that the pro forma earnings per share from continuing operations would break even for the first fiscal quarter of 2001. According to the Form 8–K, Lucent also expected results from operations to improve each quarter for the rest of the fiscal year. (*Id.*) Plaintiffs allege that the financial results included in the Form 8–K were materially false and misleading at the time it was issued based on Lucent's long-standing practice of, among other things, recognizing revenue on sales not yet final. (*Id.* at ¶ 247 (citing *id.* at ¶¶ 127–37, 197–215.))

q. *November 21, 2000 Form 8–K*

In its Form 8–K filed November 21, 2000, Lucent conceded that its October 23 forecast was inaccurate in announcing that the Company had identified a " 'revenue issue' " involving approximately $125 million in revenues relevant to the fourth fiscal quarter. Lucent also represented it could not confirm its guidance for the first quarter of fiscal year 2001. (*Id.* at ¶ 248.)

r. *December 21, 2000 announcement*

In its December 21, 2000 announcement, Lucent represented that it was restating for the second time its fourth quarter 2000 results, reducing reported quarterly earnings by $679 million. (*Id.* at ¶ 249.) Further, Lucent explicitly acknowledged the fact that the Company's results were inflated because Lucent had recognized revenue on sales not yet final. (*Id.*)

## IX. Plaintiffs' 10(b) Claims—Count I of the Fifth Complaint

The Court, as it must for purposes of this 12(b)(6) motion, has considered each allegedly actionable statement pled in the Fifth Complaint. *See* 15 U.S.C. § 78u–4(b)(1) (requiring in 10(b) actions that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading. . . ."). Scrutinizing each separately and independently from another, *see Westinghouse*, 90 F.3d at 712, the Court finds that Plaintiffs can prove a set of facts entitling them to relief for their 10b–5 claims. (*See* Fifth Compl. at Count I.) After reviewing the statements within Lucent's various press releases and other public disclosures, *see, e.g., In re Donald Trump Sec. Litig.*, 7 F.3d at 368 n. 9 (recognizing that a court may rely on factual allegations pled in other documents in reviewing a 12(b)(6) motion where a party's claims arise from those documents, and thus they are "integral to" the complaint), the Court finds that Plaintiffs have established, at least, a threshold showing that Lucent and/or the Individual Defendants violated securities laws under Sections 10(b) and 20(a) of the Exchange Act.

### 1. Allegations regarding the third fiscal quarter 2000

Defendants argue that Plaintiffs have failed to plead with particularity or with an inference of scienter that Lucent's third quarter fiscal 2000 financial results were false and misleading. (Defs.' br. at 14–18.) The Court rejects this argument. The Fifth Complaint pleads specific facts demonstrating that Defendants improperly recognized more than $200 million in revenue during third quarter 2000. It alleges that, during the third quarter, Lucent "stuffed" its distributor Graybar Electric Company, Inc. ("Graybar") with three times a single customer's annual product requirement before it ultimately reversed this $110 million transaction during the fourth quarter of fiscal 2000. (Fifth Compl. at ¶¶ 206–12.) The Fifth Complaint also states that, by no later than May 24, 2000, another distributor, Anixter International, Inc. ("Anixter") became aware during the third quarter that Lucent was shipping products not ready for use, and was accumulating within its inventory unsold and unwanted Lucent products. (Fifth Compl. at ¶ 202.) Further, an Anixter communication supports a finding that Lucent had prematurely booked revenue on more than $50 million of products shipped to Anixter during the third quarter. (*Id.* at ¶ 203.) Citing an internal e-mail, the Fifth Complaint also alleges that Lucent would have to reverse $45 million in revenue from products " 'sold' " in the third quarter absent Lucent's manipulation of its books. (*Id.* at ¶ 205.)

Plaintiffs do not baldly plead boilerplate and conclusory allegations. *See Campbell Soup*, 145 F.Supp.2d at 584 (stressing that boilerplate or conclusory pleading is necessarily fatal in pleading a securities fraud violation)(quoting *Burlington Coat*, 114 F.3d at 1418.) On the contrary, Plaintiff's allegations comply with both Rule 9(b) and PSLRA standards because they specify the allegedly misleading statements and proffer facts to support their allegations that these statements were misleading. Put another way, they specifically assert factual allegations that support the potential legal claims raised. *See Campbell Soup*, 145 F.Supp.2d at 584 (citations omitted). Moreover, Plaintiffs' pleading accomplishes the general objectives underlying both Rule 9(b) and the PSLRA; that is, it provides fair notice of the claims, *id.* at 595, and dispels any potential speculation regarding the factual basis for those claims, *id.* Significantly, too, the Court finds that Plaintiffs have satisfied these

same objectives because they have adequately investigated and substantiated their allegations. *See id.* (bolstering its finding that allegations met specificity requirements by pointing out Plaintiffs' frequent citations within their complaint to documents, discussions, phone conversations, memoranda, and specific corporate individuals.) Indeed, Plaintiffs make continuous reference to various documents, discussions, communications, and meetings, and explicitly identify the key individuals involved. *See id.*

■ Additionally, Plaintiffs have established an inference of scienter in pleading statements regarding fraudulent revenue recognition for third quarter 2000. They allege, first, that a number of key Lucent officers had explicit notice that third quarter sales involving Graybar would have to be reversed. (Fifth Compl. at ¶¶ 204–06.) Citing a May 24, 2000 Anixter e-mail, Plaintiffs assert, next, that Lucent requested Anixter to hold additional inventory, acknowledged that revenue recognition motivated its request, and estimated a "'magic number'" for third quarter revenues. Plaintiffs characterize this e-mail as "'circumstantial evidence of a senior Lucent executive, during the third fiscal quarter, intentionally drawing the distributor into the phony sales scheme.'" (Pls.' br. at 33). The Court finds that the communication could be interpreted by a reasonable factfinder as circumstantial evidence of conscious misbehavior or recklessness, *see Advanta,* 180 F.3d at 532 (defining what type of proof is necessary to establish a strong inference of fraud), and this type of evidence is sufficient to establish scienter, *Id.* (quoting *Weiner v. Quaker Oats Co.,* 129 F.3d 310, 318 n. 8 (3d Cir.1997)).

Plaintiffs also argue that "Lucent management was already aware that revenues had been inflated in previous quarters," and that they learned of these earlier accounting improprieties, at the latest, during the third quarter. (Defs.' br. at 33.) They claim that "Defendants would have been at least reckless in reporting financial results for the third quarter without first determining whether those results were also inflated." (*Id.*) The Court agrees. If Defendants were aware that accounting manipulations occurred during the first two quarters of 2000, then, conceivably, they may have been reckless in blindly reporting results for the following quarter, and proof of recklessness is enough. *See id,* 180 F.3d at 534–35 (quotation omitted.)

Having identified no deficiency in Plaintiffs' fraud allegations regarding third quarter 2000 results, the Court concludes that Plaintiffs should proceed on these claims.

### 2. Allegations regarding the fourth fiscal quarter 2000

■ Defendants argue that Plaintiffs' claims relating to Lucent's unaudited financial results for the fourth fiscal quarter 2000 lack the requisite inference of scienter. (Defs.' br. at 18–24.) Plaintiffs counter that they have pled sufficiently that Defendants acted with scienter in announcing fourth quarter results, and that Defendants had knowledge of certain suspect transactions. (Pls.' br. at 33–36.) The Court agrees with Plaintiffs. At a minimum, Plaintiffs have adequately pled that Defendants acted recklessly in reporting its revenues for fourth quarter 2000. *See id,* 180 F.3d at 534–35 (quotation omitted).

For example, Plaintiffs have alleged that Hopkins knew no later than August that Lucent was improperly recognizing revenue on sales to customers that had not yet ordered product, and was reporting inflated revenues for the fourth quarter. (Fifth Compl. at ¶ 137.) Additionally, Lucent key officers, including Hopkins, were aware

that certain transactions had generated substantial sums and were being recorded prematurely as revenue. (*Id.* at ¶¶ 174, 182–83.) Moreover, Plaintiffs allege that Lucent was compelled to reverse $452 million in revenues recorded in 2000 from purported sales to certain distributors, including Graybar and Anixter, that had an unconditional right to return unused product. (*Id.* at ¶ 197.) Plaintiffs point to Lucent internal documents demonstrating that key executives, at least some of whom reported to the Individual Defendants, knew of the improper revenue recognition, *id.* at ¶¶ 129, 134, 153, 257, and knew that senior executives had specifically allowed distributors a right to return unused product, *id.* at ¶ 98. Finally, Plaintiffs have alleged specifically that McGinn and Hopkins had direct knowledge of deficiencies in internal accounting controls. (*Id.* at ¶ 136.)

This is not a case in which Plaintiffs have pled merely rote or conclusory allegations. *Campbell Soup,* 145 F.Supp.2d at 597 (citation omitted). Instead, they provide a meticulous account of the allegedly unlawful practices in which Lucent and the Individual Defendants knowingly or recklessly engaged to gain continuous sales growth and meet or exceed analysts' expectations. *See id.* (concluding that scienter was adequately pled in part because plaintiffs offered a "detailed picture of the improper practices in which Defendants knowingly engaged to achieve ever-increasing sales and meet analysts' estimates.") Indeed, as Plaintiffs observe, this case is very similar to *Campbell Soup.* There, Plaintiffs alleged that Campbell Soup's executives and sales force "scrambled and schemed to convince their customers to purchase more and more product, far more than those customers needed." *Id.* They further alleged that, despite senior management's awareness, Campbell Soup "engaged in financial leg-

erdemain to realize the sales as revenue and mask the improprieties of their sales tactics." *Id.* The company allegedly did not disclose these activities to investors. *Id.* Based on these allegations, the *Campbell Soup* court concluded that Plaintiffs made a sufficient showing of scienter by asserting that "Campbell's new management was determined to continue the Company's growth and meet Wall Street's expectations, and have identified statements to support this." *Id.* at 598. The court found that Plaintiff's allegations created a "strong inference that the Company acted with scienter in failing to disclose material aspects of its operations and performance." *Id.*

Here, the Fifth Complaint accomplishes the same. Plaintiffs have pled allegations establishing that Defendants were on notice of Lucent's suspect activities. In reviewing these allegations and the factual evidence supporting them, *Burlington Coat,* 114 F.3d at 1426 (recognizing that just because the court elects to examine independent documents integral to the complaint does not mean that it need treat the motion as one for summary judgment), the Court finds that the Plaintiffs have amply demonstrated scienter on their claims relating to the third and fourth fiscal quarters. Thus, these claims survive Defendants' motion to dismiss.

*3. Remaining allegations regarding Lucent's products, operations, and financial projections*

Defendants move to dismiss the remainder of Plaintiffs' claims arising from a number of public statements and disclosures involving Lucent's products, operations, and financial projections. (Defs.' br. at 24–54.) Plaintiffs oppose, arguing that each claim pleads sufficiently the elements of a Section 10(b) violation. The Court

agrees with Plaintiffs, and accordingly, rejects Defendants' motion.

Mindful of the Plaintiffs' burden to prove the five elements of a 10(b) action, *see EP Medsystems, Inc.,* 235 F.3d at 871 (3d Cir.2000) (articulating the elements) (citation omitted), the Court has reviewed each of the challenged statements, namely, the October 26, 1999 press release (Defs. br. at 24–29), October 26, 1999 Bloomberg conference call (Defs. br. at 30–39), February 17, 2000 *Star–Ledger* article (Defs. br. at 40–42), May 15, 2000 Multichannel News Service article (Defs. br. at 42–43), July 20, 2000, press release and conference call (Defs. br. at 43–52), and October 10, 2000 press release (Defs. br. at 52–54). The Court considers each statement in turn.

### a. *October 26, 1999 press release and the subsequent conference call*

■ Plaintiffs allege that Lucent's 2000 Operations Plan dated November 1, 1999 contradicts Lucent's representations in its October 26, 1999 press release that the Company was enjoying continued growth and prosperity within its optical networking, wireless networking, and professional services. (Pls.' br. at 39–40.) Plaintiffs contend that the statements within this press release " 'misleadingly attributed' " growth to troubled operations and misrepresented customers' loyalties, which, in fact, had waned. (Pls. br. at 40.) According to Plaintiffs, Lucent at all relevant times was losing optical networking sales because it could not produce a satisfactory optical networking product. (Fifth Compl. at ¶¶ 4–8, 10–11, 13–17, 64–68, 74–76.)

The Court rejects Defendants' argument that Lucent's representations constitute mere puffery. Only "[c]ertain vague and general statements of optimism ... are considered 'puffery' and are understood by reasonable investors as such." *In re Penn*

*Treaty Am. Corp. Sec. Litig.,* 202 F.Supp.2d at 392 (E.D.Pa.2002) (citing *Burlington Coat,* 114 F.3d at 1428 n. 4). Defendants' representations were neither vague nor general. Rather than acknowledge internal problems, Defendants made statements suggesting that no such problems existed. The Court finds that a reasonable investor may have considered important information relating to Lucent's product sales and its customers' deteriorating loyalties in making investment decisions. *See Burlington Coat,* 114 F.3d at 1425 (defining material information in a 10(b) case).

■ Moreover, the Court finds that the requisite inference of scienter supports Plaintiffs' allegations relevant to the October 26 press release and subsequent conference call. For example, according to the Fifth Complaint, key executives presented the 2000 Operations Plan to McGinn. (Fifth Compl. at ¶ 54.) Additionally, Plaintiffs allege that McGinn knew as early as October 1999, that Lucent needed to modify its 2000 financial projections as a result of product unavailability and declining demand for existing products. (Fifth Compl. at ¶¶ 6, 257(a)(1).) Though the 2000 Operations Plan postdates by six days the press release, this later statement can, as a matter of law, provide a basis for finding that Lucent and/or the Individual Defendants had critical knowledge of Company problems at all relevant times. *See Rothman v. Gregor,* 220 F.3d 81, 92 (2d Cir.2000).

■ Similarly, all allegations concerning the October 26 conference call withstand this motion to dismiss. During the conference call, McGinn allegedly perpetuated the misrepresentations by characterizing Lucent as a market " 'leader' " reaping " 'exceptionally strong growth in ... optical networking.' " (Fifth Compl. at ¶ 219.) As pled in the Fifth Complaint,

McGinn represented that Lucent's optical networking business was growing at the same rate as the market, 40 to 50%. (*Id.* at ¶ 219.) The Court rejects Defendants' argument that McGinn's statements amount to forward-looking statements regarding the Company's economic performance and position in a changing market. (Defs.' br. at 31.) Forward-looking statements include only statements containing a projection of revenues, income, earnings per share, capital expenditures, dividends, capital structure, or other financial items, statements of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer, and statements of future economic performance. 15 U.S.C. § 78u–5(i)(1). A defendant has no liability for a forward-looking statement if the statement is either immaterial or is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." § 78u–5(c)(1)(A). Yet a plaintiff can defeat this "safe harbor" by demonstrating that the statement "was made with actual knowledge ... that ... [it] was false or misleading." § 78u–5(c)(1)(B).

Defendants contend that McGinn's statement enjoys safe harbor protection because it was made with "actual knowledge" of its falsity. (Defs.' br. at 31.) Plaintiffs counter that McGinn's statement "conveyed information about an existing fact," and thus, is not a forward looking statement. They argue alternatively that, even if McGinn's statement is a forward-looking statement, it lacks any meaningful cautionary statement. (Pls.' br. at 43.) The Court finds that McGinn's statement can not be fairly characterized as "forward-looking." Indeed, it depicted both previous and then existing growth rate issues.

Since the conference call offered McGinn an opportunity to elaborate on previously disclosed, false information concerning the Company's growth in optical networking, the Court finds that Plaintiffs shall proceed on their allegations concerning the conference call statements.

> *b.* *November 11th guidance to analysts*

■ Further, the Court has reviewed Defendants' November 11 statements to market analysts (Fifth Compl. at ¶¶ 221–22), and finds that Plaintiffs may also pursue their allegations arising from these statements. The allegations support a finding that Lucent's statements misrepresented their actual status within the optical networking market. Again, since these statements depict, in part, the Company's past and current performance, safe-harbor protections are inapplicable. *See* § 78u–5(i)(1). Though Defendants claim that meaningful cautionary language accompanies their statements, *see* 15 U.S.C. § 78u–5(c)(1), the Court need not resolve this issue at this juncture. The question whether any cautionary language is sufficiently "meaningful" raises fact issues that are improperly resolved on this motion to dismiss. *See Fecht v. Price Co.,* 70 F.3d 1078, 1080 (9th Cir.1995).

> *c.* *January 6, 2000 press release*

■ In reviewing the January 6 press release and the allegations relevant to it, the Court finds that Plaintiffs have adequately pled facts demonstrating that Lucent did not attribute its revenue loss for the first fiscal quarter of 2000 to its true causes, namely, decreased product demand and an inability to produce the desired product. (*See* Fifth Compl. at ¶¶ 67, 76, 86, 103, 92, 223(c).) Plaintiffs have pled an actionable misrepresentation or omission. Construing Plaintiffs' allegations as true,

the Court observes that Lucent omitted critical facts explaining the reasons for the revenue loss and in doing so, withheld information that a reasonable investor might consider important in making investment decisions. *See Burlington Coat,* 114 F.3d at 1425.

Moreover, Plaintiffs have pled the requisite scienter here. Their allegations suggest that Lucent senior management was aware before January 6, 2000, that decreased sales during 1999 stemmed from the Company's failure to develop a functional product in demand and to generate customer demand for its existing, functional optical networking products. (Fifth Compl. at ¶¶ 67, 74, 103–04, 257(c)(2).) Additionally, Plaintiffs raise post-January 6 facts supporting an inference that Lucent had knowledge at all critical times, and these facts can not be disregarded in determining whether the scienter requirements are met. *See Rothman,* 220 F.3d at 92. Accordingly, this claim survives this motion to dismiss.

### d. *February 17, 2000 Star Ledger article*

Having identified no pleading defect relevant to the February 17, 2000 allegations, the Court determines that Plaintiffs may pursue their claim on these allegations. Contradicting these February 17 representations, Plaintiffs have asserted, for example, that a high-level internal report dated February 9, 2000 describes a number of Lucent's market troubles (Fifth Compl. at ¶ 78), and observes that Lucent " 'must improve perception of Lucent products, features and functionality or risk losing all market share' " (*Id.* at ¶ 79). In so asserting, Plaintiffs have pled particularized allegations demonstrating that McGinn's representations that demand for Lucent's optical networking products " 're-

mains robust' " were knowingly false or, at a minimum, reckless when made.

Additionally, the Court rejects Defendants' argument that McGinn's statements amount to " 'inactionable puffery' " (Defs.' br. at 40). His statement does not appear to be vague or generally optimistic, especially in light of the context in which it was made. *See In re Penn Treaty Am. Corp. Sec. Litig.,* 202 F.Supp.2d 383, 392–93 (E.D.Pa.2002) (determining that senior executive's statement that the company was not in trouble in response to analyst's question whether company had outgrown its capital base and was running out of necessary funds was not mere puffery because, read in its context, it was neither vague nor generally optimistic.) Finding no legitimate basis to invoke the safe harbor, the Court further rejects any such protection for McGinn's statements.

### e. *May 15, 2000 Multichannel news service*

In this May 15, 2000 news article, Lucent announced that it would sell six billion dollars of optical networking gear in 2000, a two million dollar increase from its 1999 sales. (Fifth Compl. at ¶ 231.) Commenting on the Company's 2000 sales, one Lucent spokesperson characterized demand for optical products as " 'unprecedented' " and further represented that first quarter problems had been resolved. (*Id.*) Plaintiffs' fraud allegations regarding these statements meet particularity requirements. These allegations are neither vague nor conclusory. *See Campbell Soup,* 145 F.Supp.2d at 584. Rather, Plaintiffs plead specifically that Defendants had knowledge of significantly decreased demand for Lucent products, inferior product, and customer problems. (Fifth Compl. at ¶¶ 74, 78–80, 93, 98,99, 104, 257.) Moreover, they proffer allegations supporting a credible finding that

Lucent's statements regarding demand were false and misleading. Specifically, Plaintiffs continuously allege that older optical networking products were not in great demand and yet Lucent was incapable of satisfying the diminished demand for those dated products. (*Id.* at ¶¶ 65, 67, 81, 100–04, 76, 78–80.)

Furthermore, the Court finds no support for Defendants' argument that these statements constitute puffery or, alternatively, fall within the safe harbor for forward-looking statements. The May 15, 2000 statements are misleading in that they improperly suggest that Lucent had significant support upon which to base its $6 billion figure for 2000 sales, and fail to disclose Lucent's internal problems in developing and producing a functional OC–192 product. (*Id.* at ¶¶ 231, 64–68.)

### f. July 20, 2000 press release and conference call

■ The Court also finds no pleading deficiencies relevant to Lucent's July 20, 2000 statements. Via a July 20 press release and subsequent conference call, Lucent announced its third fiscal quarter results, stating that its OC–192 optical systems were generating "strong customer acceptance," and providing guidance for the fourth fiscal quarter of 2000. The Fifth Complaint sets forth particularized allegations showing that each representation was either false or misleading. (*Id.* at ¶¶ 234–35, 96–99, 149.) It details, for example, senior management's explicit knowledge or awareness of Lucent's product problems with AT & T, the lack of customer orders, and the anticipated impact on revenues for 2000 and 2001. (*Id.* at ¶¶ 99, 232(d), 202.) Plaintiffs also point to specific communications involving various key personnel that support their allegation that Lucent was well aware of its market problems and their resultant inability to meet analysts' future quarterly projections. (*Id.* at ¶¶ 99, 153, 157, 160.).

Reading Defendants' statements within their proper context, the Court rejects Defendants' argument that the " 'strong customer acceptance' " statement was mere puffery. Given the third fiscal quarter results, a reasonable investor likely would consider material any information relating to customer acceptance of key products for purposes of making investment decisions. *See Advanta*, 180 F.3d at 538 (noting that "puffery" is not actionable because it is immaterial or, put another way, it poses no " 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' ") (citations and quotations omitted). Though Defendants again attempt to rest on meaningful cautionary language to reap safe harbor protection (Defs.' br. at 45), the Court declines to consider whether this language was "meaningful" so as to avoid inappropriate fact-finding on this motion to dismiss. *See Fecht*, 70 F.3d at 1080.

■ Importantly, too, the Court finds that Plaintiffs have offered sufficient allegations to demonstrate that Hopkins' July 20, 2000 statements were misleading. Their allegations, when taken as true, support a claim that Hopkins misrepresented the nature and quality of Lucent's credit policies when she stated that Lucent programs " 'do not vary significantly from our competitors from the types of risks we take and the way we structure our transactions.' " (*Id.* at ¶¶ 237, 241.) In particular, Plaintiffs have pled in detail that Lucent's credit policies were, in fact, unsound and were unusually risky. (*Id.* at ¶¶ 138–46.). Accordingly, Plaintiffs may pursue their claims relevant to Lucent's July 20, 2000 representations.

*g. October 10, 2000 press release*

Relying again on their cautionary statements, Defendants also claim safe-harbor protection for statements made within the October 10, 2000 press release. To reiterate, a determination whether Defendants are entitled to this protection requires this Court to engage in fact-finding, and it declines to do so here. *See Fecht,* 70 F.3d at 1080.

## X. Plaintiffs' § 20(a) Claim—Count II of the Fifth Complaint

Count II of the Fifth Complaint alleges that McGinn, Peterson, and Hopkins, as controlling persons of Lucent under § 20(a) of the Exchange Act, are liable under § 10(b) for all securities fraud violations. Count II is derivative of Count I, and is therefore not dismissed. *See Milestone Scientific,* 103 F.Supp.2d at 474 (recognizing that secondary liability under section 20(a) only attaches where a plaintiff pleads a primary violation of the Exchange Act). Because Plaintiffs have adequately pled a primary violation of the Exchange Act, Defendants' motion to dismiss Count II of the Fifth Complaint is also denied.

## XI. Conclusion

For the reasons stated above, Defendants' motion to dismiss is denied. An appropriate order follows.