

2004 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-17-2004

# GSC Partners CDO v. Washington

Precedential or Non-Precedential: Precedential

Docket No. 03-2347

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2004

Recommended Citation

"GSC Partners CDO v. Washington" (2004). *2004 Decisions.* Paper 660.
http://digitalcommons.law.villanova.edu/thirdcircuit_2004/660

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2004 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL
UNITED STATES COURT OF
APPEALS
FOR THE THIRD CIRCUIT
_____

No: 03-2347
_____

GSC PARTNERS CDO FUND;
GSC PARTNERS CDO FUND II, LTD;
GSC RECOVERY II, L.P.,

Appellants

v.

DENNIS R. WASHINGTON;
STEVEN G. HANKS; THOMAS H.
ZARGES;
ANTHONY S. CLEBERG; DAVID H.
BATCHELDER;
LEONARD R. JUDD; ROBERT S.
MILLER, JR.;
DORN PARKINSON; TERRY W.
PAYNE;
JOHN D. ROACH; CREDIT SUISSE
FIRST
BOSTON CORPORATION; JOHN
DOES I THROUGH X

_____

Appeal from the United States District
Court
for the District of New Jersey
(D.C. Civil Action No.01-CV-04905)
District Judge: Honorable Anne E.
Thompson

_____

Argued on December 19, 2003

Before: ROTH, MCKEE and
CUDAHY* , Circuit Judges

(Opinion filed  May 17, 2004)

Howard J. Kaplan, Esquire (Argued)
Stanley S. Arkin, Esquire
590 Madison Avenue
35th Floor
New York, NY 10022

Bruce H. Snyder, Esquire
Sheppard A. Guryan, Esquire
Lasser Hochman
75 Eisenhower Parkway
Roseland, NJ 07068

Counsel for Appellants

Shannon M. Kasley, Esquire
Beth Heiftz, Esquire (Argued)
Adrian Wager-Zito, Esquire
Megyn M. Kendall, Esquire
Jones Day
51 Louisiana Avenue, N.W.
Washington, D.C. 20001

Robinson B. Lacy, Esquire (Argued)
Sullivan & Cromwell LLP
125 Broad Street
New York, New York 10004

Anthony J. Marchetta
Pitney, Hardin, Kipp & Szuch LLP
P.O. Box 1945
Morristown, New Jersey 07962

_____

*The Hon.Richard D. Cudahy, Circuit
Judge for the United States Court of
Appeals for the Seventh Circuit, sitting
by designation.

Christopher J. Carey, Esquire
David Blackwell, Esquire
Graham, Curtin & Sheridan
Four Headquarters Plaza, P.O. Box 1991
Morristown, New Jersey 07962-1991

George T. Manning, Esquire
Jones Day
1420 Peachtree Street, N.E.
Atlanta, Georgia   30309-3053

Counsel for Appellees

---

O P I N I O N

---

CUDAHY, Circuit Judge

The background of this case is the classic corporate love story.  Company A meets Company B.  They are attracted to each other and after a brief courtship, they merge.  Investor C, hoping that the two companies will be fruitful and multiply, agrees to pay $50 million for the wedding. Nine months later, however, things begin to fall apart and the combined entity declares bankruptcy.  Investor C feels misled.  He believes that Company A knew that there were problems with Company B but that it made the oft repeated mistake of thinking that it would be able to change Company B for the better.  Investor C files suit in the district court and after his complaint is dismissed, we find ourselves here.  It is an old story but it never fails to elicit a tear.

In this case, appellants GSC Partners CDO Fund, Ltd., GSC Partners CDO Fund, Ltd. II, LTD., and GSC Recovery II, L.P. (the plaintiffs) appeal the district court's dismissal of their action against individual officers and directors of Washington Group International, Inc. (Washington) and Credit Suisse First Boston Corporation (CSFB).    The plaintiffs filed this action under section 10(b), Rule 10b-5 of the Securities Exchange Act of 1934 (the Act), alleging that their purchase from CSFB of $48.8 million in notes, which Washington used to finance its acquisition of Raytheon Engineers & Constructors International, Inc. (REC), was carried out pursuant to defendants' allegedly false and misleading offering circular.  Because the plaintiffs failed to meet the heightened pleading requirements of the Act, we affirm the district court's grant of defendants' motion to dismiss.

I.

Washington is an international engineering and construction firm that, in 2000, employed approximately 39,000 workers and brought in approximately $5 billion in annual revenue.[1]  App. at 41, 77. Defendants Dennis R. Washington, Hanks, Zarges, Cleberg, Batchelder, Judd, Miller, Parkinson, Payne, and Roach were officers and/or directors of Washington during the acquisition process.  App. at 38-9 (Cplt. ¶ 14-23).

Washington    representatives

---

[1] Washington was known as Morrison Knudsen Corporation (sometimes referred to as MK) before the note offering.  App. at 41. The company filed for bankruptcy protection in May 2001, and was not named as a defendant in this action.

-2-

commenced negotiations during the summer of 1999 for the acquisition of REC, the engineering and construction division of Raytheon Company. App. at 42 (Cplt. ¶ 37). After conducting an initial examination of REC's financial information, Washington submitted a non-binding offer of between $775 and $875 million for the business operations of REC, subject to its findings in due diligence. App. at 42 (Cplt. ¶ 39). Raytheon accepted this offer in September 1999. *Id*. at ¶ 41. Before finalizing the deal, Washington began its due diligence process, which entailed thorough scrutiny of REC's financial statements and projections. *Id*. In this process, it received assistance from Arthur Andersen, L.L.P. *Id*. at ¶ 41. Meanwhile, the parties began negotiating a definitive agreement for the acquisition. *Id*. at ¶ 40. To augment this process, Washington employed defendant CSFB to act as its financial advisor for the REC purchase. *Id*. at ¶ 40. CSFB conducted its own due diligence and had access to all of Washington's due diligence findings as well. *Id*. at ¶ 43. Throughout the due diligence process, the two companies communicated their findings and concerns to each other. *Id*.

On October 27, 1999, after one month of interviews, document reviews and project site visits, Washington's management reported to the Washington Board its findings regarding the accuracy of REC's financial information. App. at 44 (Cplt. ¶ 46), 317. The team was impressed with the "[s]trong, capable management team in place" and with REC's "solid position in [the] Independent Power Producer (IPP) market," as well as in the rail, power, chemicals, metals pharmaceutical, pulp and paper, chemical demilitarization, refinery and heavy maintenance markets. App. at 320. The team also noted that the personnel it worked with had been "cooperative and forthcoming." *Id*. at 317.

The due diligence team expressed some concerns as well. It cited as among REC's general weaknesses its "aggressive" and "optimistic" plans for sales volume and profit growth in certain businesses, the volatility of the company's working capital, the possible lack of accounting integrity of its unaudited financial statements and its "[u]nderstated or undisclosed liabilities." *Id*. at 319. In particular, the team calculated that the profit projections for some of the construction projects were inaccurate. For example, the team revised estimated profit projections for the "Pine Bluff" project from $20.2 million to $3.1 million, for the "SADAF" project from $4.2 million to $0.8 million and for the Hudson Bergen project from $61.1 million to $46.9 million. *Id*. at 326. At the same time, however, Washington noted, that "[w]ider leverage of proprietary technology" could improve some of the projects' deteriorating margins, and that "[o]perational synergies offer [an] upside to a combined new company." *Id*. at 346.

On November 3, defendant Zarges sent a memorandum to other members of the Washington management, elaborating on some of the perceived inaccuracies in the project profit estimates but projecting

that if the acquisition went through, even taking into account the risks, the combined entity could perform well in the engineering and construction industry. App. at 362. Zarges first emphasized that the findings in the October 27 Board presentation were not conclusive. *Id*. He wrote that, although the Umatilla and Pine Bluff projects had been presented as breakeven projects through 2001, they were at the time of the memo in "loss positions with deteriorating performance trends." App. at 364. The memorandum reiterated concerns about Raytheon's aggressive plans and optimistic positions on most projects, reporting inconsistencies and shaky performance history. *Id*. at 365-66. Zarges concluded, however, that the projected operating fee (i.e. profit) in 2000 *could*, taking into account Washington's adjustments to REC's calculations, "provide an industry-leading margin of 3.8% on adjusted revenues." App. at 362. He added, "This . . . represents quite an improvement over recent performance histories . . . [and] is no easy task." *Id*.

A month later, on December 2, 1999, defendant Hanks sent a memorandum to the Board on the progress of the due diligence team. App. at 362. He reported that in order to address Washington's concerns about the accuracy of REC's financial statements, Washington had hired PricewaterhouseCoopers L.L.P., independent accountants, to audit the financial statements for 1996, 1997, and 1998, and to "review" the financial statement for 1999. App. at 207, 367. These audited financial statements required $350 million of adjustments to

bring them into compliance with Generally Accepted Accounting Principles (GAAP). *Id*. Hanks stipulated that in order to remedy the discrepancies, it would be necessary to arrange for an increase in liabilities assumed by Raytheon of up to $100 million. *Id*.

The Washington Board met on March 14, 2000 to consider the progress of the due diligence team. App. at 548-88. The team again reported some concerns about REC's financial health, but also expressed confidence that a partnership with Washington would improve REC's position, "having actually experienced what it takes to turn a company around." App. at 420, 422. The team reported risks involved in the acquisition of REC, citing historical performance that was characterized by large loss projects. *Id*. at 554. The team revised the projected profit for the Umatilla project downward to "22M loss, best case," an adjustment of $38 million from REC's estimate. App. at 559. It also adjusted the projected profit for the Pine Bluff project from breakeven to a $20 million loss. *Id*. REC had "[p]oor financial controls/accounting practices," and the team suspected that there may have been inadequate restructuring reserves in The Hague and in Houston. *Id*. at 554. The due diligence team also revised REC's projected EBITDA (earnings before interest, taxes, depreciation and amortization) for the year 2000, from $143 million to $115 million, assuming that the combined company would be indemnified by Raytheon against any downside from Umatilla and Pine Bluff and that it "would

-4-

incur 50% of the $60 million of vulnerabilities identified in the due diligence report." *Id*. at 420-21, 567.

In addition, the due diligence team had encountered practical difficulties in completing the due diligence. Defendant Hanks recorded in his notes and reported to the board that "the due diligence and negotiation process has been a difficult one- Raytheon's procedural rules limited our opportunities for open and candid discussions with management, limited our ability to see company offices and projects … and Raytheon has not been cooperative with Washington Group's attempts to reconcile the [discrepancies between financial and operational reports and other comparative data]." App. at 418, 552. These limitations led Hanks to suspect that Raytheon was "hiding serious business issues and problems." *Id*. The same concern had been recorded in the November 3 memorandum, which noted that the "team has been concerned about the abrupt limits of the due diligence process and data. With 2 ½ weeks to evaluate data, the diligence was restricted to selected high-impact projects and issues." App. at 365.

Hanks also recorded in his presentation notes some high points disclosed by the due diligence process. He wrote, "Raytheon's Power Group is poised to benefit greatly from the surge in demand for new power," and expressed confidence that "[t]he combination of MK's contractors unit with Raytheon's Infrastructure business would create the most experienced and powerful provider of Design and build services in the infrastructure market today." *Id*. at 422. In addition, "[t]he combination of MK's industrial process unit with Raytheon's industrial unit affords synergetic opportunities … and a greatly improved client base." *Id*. at 422-23. He reported that the due diligence team was not in complete agreement as to the value of REC. *Id*. at 423. He highlighted some points on which they all agreed, however, including that "[t]he strengths of MK – and the strengths of Raytheon are complementary" and that "the Markets that the combined MK/Raytheon will serve going forward are the fastest growing segments of the industry." *Id*. at 424. His notes concluded by suggesting that Washington should pursue the acquisition. *Id*.

Zarges' April 3 memorandum was more positive about the team's access to data, reporting that the recent site visits were "more informative." App. at 433. Having been given more access to data, the team had been able to update its calculations about profit from operations. Its findings did confirm some losses. In large part due to the lower profitability of the Damshead Creek and San Roque projects, the team reduced its estimate of REC's 2000 operating fee from $63 million to $45 million. *Id*. at 433, 653, 655. A further memorandum dated July 6 disclosed that for certain projects, the "total MAC [material adverse changes] estimate – project deterioration/understated liabilities" was $73.5 million. App. at 657.

It appears that throughout the due

diligence process, the due diligence team and the Washington Board communicated regularly and frankly about their assessment of REC's strengths and weaknesses. At no point in this process did the Washington management express the conviction that the acquisition would prove a failure. In fact, the management team took steps to remedy the weaknesses it pinpointed by renegotiating the purchase so as to avoid acquisition of liabilities and risky projects. App. at 81.

On April 14, 2000, Washington entered into a Stock Purchase Agreement with Raytheon and REC. *Id*. The agreement specified that the purchase price, which was to be based on the April 30, 2000 balance sheet, would be approximately $510 million—between $265 and $365 million less than Washington's initial offer. *Id*. Washington would acquire the engineering, design, procurement, construction, operation and maintenance business of REC, as well as the capital stock of certain REC subsidiaries. App. at 51 (Cplt. ¶ 78). The purchase price reflected the exclusion of the four most significant REC loss projects, for which Raytheon had agreed to retain liability. *Id*. at 51 (Cplt. ¶ 77), 81. Raytheon also agreed to "retain specified assets" of REC and to indemnify Washington for "specified liabilities of REC and its subsidiaries." App. at 81. Later, Washington was able to get Raytheon to retain partial liability for the Umatilla project as well, which Washington had predicted was in a position to show a loss

of $22 million. *See* Supp. App. (discussed *supra* at n.1).

On July 7, 2000, Washington's acquisition of REC closed. App. at 52 (Cplt. ¶ 82). The acquisition was primarily financed through the $300 million note offering, sold pursuant to a confidential offering circular dated June 28, 2000. *Id*. at ¶¶ 86-7. The offering circular included certain audited financial statements as well as unaudited financial statements for the first quarter of 1999 and the first quarter of 2000. App. 286-96. Defendant CSFB was one of the lead underwriters and initial purchasers of the notes. App. at 53 (Cplt. ¶ 88). It purchased $225 million in principal amount of the notes, then offered and resold some of those notes to the petitioners, who purchased $48.8 million face amount of notes. *Id*. (Cplt. ¶ 93).

On October 23, 2000, Washington's Form 10-Q filing announced that as a result of "a comprehensive review" of REC's existing contracts, Washington "reduced [REC's] net assets relating to long-term contracts in the preliminary purchase price by approximately $325 [million] . . . [and] had made reductions in net contract assets in the preliminary purchase price allocation of approximately $225 [million]." App. at 58-59 (Cplt. ¶ 105). Washington also disclosed that it had to record approximately $1.2 billion in goodwill. *Id*. In a press release dated March 2, 2001, Washington disclosed that "[s]everal [REC] projects had serious undisclosed problems and were in trouble" before it acquired REC. App. at 59 (Cplt. ¶ 110). It noted that as of September 1,

2000, Washington had reduced REC's assets and increased its liabilities by approximately $700 million from the amounts originally estimated. App. at 60 (Cplt. ¶ 111). On March 8, 2001, Washington's Form 8-K filing indicated that REC's financial statements referred to in the circular should not be relied upon. *Id.* at ¶ 112.

On May 14, 2001, Washington and some of its subsidiaries filed petitions in bankruptcy in the Bankruptcy Court in Nevada for relief pursuant to Chapter 11 of the Bankruptcy Code. *Id.* at 61 (Cplt. ¶ 117). Washington also filed a complaint in a Idaho state court against Raytheon alleging fraudulent inducement, fraud and misrepresentation, requesting rescission or specific performance. App. at 455-81. That suit was apparently settled in November 2001, and is under a confidentiality restriction. Pl. Br. at 17 n.4. Plaintiffs commenced this action alleging violation of federal and state securities laws. *Id.* at 37-8. In January 2002, the defendants filed a motion to dismiss plaintiffs' amended complaint. Although no formal discovery had taken place in the civil action, the plaintiffs were able to obtain access through Washington's bankruptcy to documents discussed in the instant opinion. The district court granted the defendants' motion, holding that the complaint failed to state a cause of action for securities fraud. App. at 1. This appeal followed.

II.

We exercise plenary review over the district court's decision to grant the defendants' motions to dismiss. *See*

*Broselow v. Fisher*, 319 F.3d 605, 607 (3d Cir. 2003). We also exercise plenary review over the district court's interpretation of federal securities laws. *See Oran v. Stafford*, 226 F.3d 275, 281 n.2 (3d Cir. 2000); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 706 (3d Cir. 1996). We accept all allegations in the plaintiffs' complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Oran*, 226 F.3d at 279. A court may look beyond the complaint to extrinsic documents when the plaintiffs' claims are based on those documents. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). A court may not dismiss the complaint unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims that would entitle them to relief. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 215-16 (3d Cir. 2002).

The plaintiffs allege a violation under Section 10(b) of the 1934 Securities Exchange Act and Rule 10b-5 under it. In order to state a claim under Rule 10b-5, plaintiffs must allege "with particularity" that defendants (1) made a misstatement or omission of material fact (2) with scienter (3) in connection with the purchase or the sale of a security (4) upon which the plaintiffs reasonably relied and (5) the plaintiffs' reliance was the proximate cause of their injury. *Semerenko v. Cedant Corp.*, 223 F.3d 165, 174 (3d. Cir. 2000); *see also In re Westinghouse*, 90 F.3d at 710.

The plaintiffs' securities fraud claim is also subject to heightened

pleading requirements. Under Federal Rule of Civil Procedure 9(b), "[i]n all averments of fraud . . . , the circumstances constituting fraud . . .shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). This particularity requirement is "rigorously applied in securities fraud cases." *Burlington*, 114 F.3d at 1417. The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u, "imposes another layer of factual particularity to allegations of securities fraud." *In re Rockefeller*, 311 F.3d at 217. If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory. 15 U.S.C. § 78u-4(b)(3)(A). The PSLRA requires the complaint to specify "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

With regard to the "scienter" component of the 10b-5 claim, the critical issue before this Court, the PSLRA further requires the plaintiffs, "with respect to each act or omission," to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This particularity requirement supersedes Rule 9(b)'s provision allowing state of mind to be averred generally. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1328 (3d Cir. 2002) (citing *In re*

*Advanta Corp. Sec. Litig.*, 180 F.3d 525, 531 n.5 (3d Cir. 1999)).

The plaintiffs may establish a "strong inference" that the defendants acted with "scienter" "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *In re Burlington*, 114 F.3d at 1418 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir. 1995)); *see also In re Advanta*, 180 F.3d at 534-35; *Oran*, 226 F.3d at 288-89.

A.  *Motive and opportunity*

Motive must be supported by facts stated "with particularity," and must give rise to a "strong inference" of scienter. *In re Advanta*, 180 F.3d at 535; 15 U.S.C. § 78u-4(b)(2). "Blanket assertions of motive and opportunity" will not suffice, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter." *In re Advanta*, 180 F.3d at 535. Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir. 2001) (citation omitted).

In their amended complaint, the plaintiffs allege that the defendants' motive to commit fraud was that

Washington "would not have been able to acquire REC without the successful issuance of the Notes," and would not have been able to sell any of the notes at or near the price sought "had the true financial condition of the REC been revealed in the Circular." Pl. Br. at 32; App. at 37, 53 (Cplt. ¶¶ 7, 86, 89). Further, the complaint suggests that because defendant Dennis Washington received stock options in 1999 after Washington acquired Westinghouse, it can be inferred that he would receive stock options after the present merger. *See* App. at 41, (Cplt. ¶ 36). Plaintiffs argue that these alleged stock options provided Washington with an additional motive to commit fraud. These allegations are insufficient.

In every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction. Such allegations alone cannot give rise to a "strong inference" of fraudulent intent. *See In re Burlington*, 114 F.3d at 1424; *see also Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 623 (4th Cir. 1999) ("Similar situations arise in every merger; thus, allowing a plaintiff to prove a motive to defraud by simply alleging a corporate defendant's desire to retain his position with its attendant salary, or realize gains on company stock, would force the directors of virtually every company to defend securities fraud actions every time that company effected a merger or acquisition."); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip*

*Morris Cos.,* 75 F.3d 801, 813-14 (2d Cir. 1996) (finding that a "company's desire to maintain a high bond or credit rating" insufficient motive for fraud because such motive could be imputed to any company); *Tuchman v. DSC Communications Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (citation omitted); *Herzog v. GT Interactive Software Corp.,* 98 Civ. 0085, 1999 WL 1072500, at *9 (S.D.N.Y. Nov. 29, 1999) (holding that a defendant's "'desire to consummate [a] corporate transaction does not constitute a motive for securities fraud'"); *Leventhal v. Tow,* 48 F. Supp. 2d 104, 115 (D. Conn. 1999) ("[T]he allegation that the defendants artificially inflated Citizens' stock price in order to 'protect and enhance their executive positions' and 'negotiate as favorable a deal as possible' on a pending employment contract also fail[s] to give rise to a strong inference of scienter. This motive has been rejected routinely."); *Thacker v. Medaphis Corp.,* 97 Civ. 2849, 1998 WL 684595, at *3 (S.D.N.Y. Sept. 30, 1998) (finding plaintiff's claim that defendant was motivated by a desire to eliminate competitors and to acquire related companies insufficient to plead scienter because such motive could be imputed to any corporate officer).

Although the allegation is not apparent from the complaint, plaintiffs now argue that CSFB had a motive to commit fraud because it stood to receive underwriting and financial advisory fees. This allegation is undoubtedly true but equally unavailing. *See Melder v. Morris*,

27 F.3d 1097, 1104 (5th Cir. 1994) (declining to find scienter where plaintiffs alleged that underwriters' motive in participating in fraud was to collect fees); *Schnell v. Conseco, Inc.,* 43 F. Supp. 2d 438, 449 (S.D.N.Y. 1999) ("[A]n underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every underwriter, law firm, accountant, and investment advisor whose compensation or commission depended on the completion of an initial public offering would have a motive to commit fraud, which would make Rule 9(b) wholly meaningless.") (quoting *Fisher v. Offerman & Co., Inc.,* No. 95 Civ. 2566, 1996 WL 563141 at *6 (S.D.N.Y. Oct. 2, 1996)). Therefore, plaintiffs have failed to meet the scienter requirement by pleading motive and opportunity to commit fraud on the part of any of the defendants.

B.    *Recklessness or conscious misbehavior*

Because the plaintiffs have not adequately pleaded that the defendants had both motive and opportunity to commit fraud, their complaint will survive the motion to dismiss only if they allege specific facts that constitute "strong circumstantial evidence of conscious misbehavior or recklessness." *Oran*, 226 F.3d at 288-289; *Kalnit*, 264 F.3d at 142 ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater.")

(quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

A reckless statement is a material misrepresentation or omission "'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'" *In re Advanta*, 180 F.3d at 535 (quoting *McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir. 1979)).

The plaintiffs argue that they "alleged specific information transmitted to Defendants prior to issuance of the Offering Circular and sale of the Notes that contradicted representations made in the Circular, identifying who communicated them to whom, when, and how." Pl. Br. at 23. In other words, it is the plaintiffs' position that the defendants had actual knowledge of the falsity of their statements in the circular at the time they were made. It is certainly true that "in a non-disclosure situation, any required element of scienter is satisfied where . . . the defendant had actual knowledge of the material information." *Fenstermacher v. Phila. Nat'l Bank*, 493 F.2d 333, 340 (3d Cir. 1974); *see also In re Advanta*, 180 F.3d at 535.

Of course, it is not enough for plaintiffs to merely allege that defendants "knew" their statements were fraudulent or that defendants "must have known" their statements were false. *See In re Digital Island Sec. Litig.,* 357 F.3d 322, 328-29

(3d Cir. 2004); *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (finding no scienter where plaintiffs did "not allege facts and circumstances that would support an inference that defendants knew of specific facts that are contrary to their public statements"); *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 361 (6th Cir. 2001) ("Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud."). Plaintiffs must plead allegations of scienter with particularity. *See* 15 U.S.C. § 78u-4(b)(2). They must support their allegations with the essential factual background that would accompany "the first paragraph of any newspaper story"—that is, the "who, what, when, where and how" of the events at issue. *In re Burlington,* 114 F.3d at 1422 (citing *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990)).

Although the plaintiffs argue that they have demonstrated that the defendants had "actual knowledge" that their public statements were false and misleading at the time in which they were made, the plaintiffs have failed to plead with particularity facts that so demonstrate. The plaintiffs point to many statements that the individual defendants made during the due diligence period as evidence that they had actual knowledge that their circular statements were false and misleading. However, these statements made during the due diligence period cannot be connected directly to any misleading statement in the offering circular.

1. *Liabilities*

The plaintiffs allege a number of different affirmative misstatements that form the basis of their 10b-5 claim. First, the plaintiffs argue that the circular was misleading in including REC's financials for the 2000 stub period which indicated "that as of April 2, 2000, REC had liabilities of $1,279,333." Reply Br. at 6; Pl. Br. at 26-7; App. at 288. To establish that Washington had actual knowledge to the contrary, plaintiffs refer to a comment in Washington's October 27, 1999 presentation which indicated that REC had "understated or undisclosed liabilities." *See* App. at 44 (Cplt. ¶ 48), App. at 319. However, this comment could not have been made in reference to the financial statements for the stub period between January and April 2000, since those statements would not have been available in October of 1999. *See* App. at 47 (Cplt. ¶ 59-60) (noting that as of December 2, 1999 "Washington Group had 'requested "audited" financials for RE&C for years 1996, 1997, and 1998 and "reviewed" financial statements for the stub period from January 1 to September 30, 1999.'"). Moreover, in the October 27th presentation, Washington was referring to understated liabilities in REC's *unaudited* financial statements. App. at 319 (referring to "[a]ccounting integrity of financial statements (unaudited) provided to date"). These statements were later audited and adjusted to comply with GAAP before they were incorporated into the circular. App. at 367. Plaintiffs present no evidence that Washington had actual knowledge that the *audited* statements were inaccurate during the relevant time period.

Plaintiffs also rely on their complaint allegation that "[a]s of January 4, 2000, Washington Group and Defendants knew that REC's financial statements of September 30, 1999 overstated assets by approximately $275 million and understated liabilities by $145 million." Reply Br. at 6; App. at 47-48 (Cplt. ¶ 62). The plaintiffs, however, do not provide any source to connect this accusation to record evidence. In other words, plaintiffs have failed to plead with particularity. *See In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 300 (D.N.J. 2001) ("Simply referring to a series of public statements and then alleging, in a general and conclusory manner, that those disclosures were false or misleading is insufficient."). Plaintiffs do not even mention whether, in this paragraph, they are referring to REC's audited or unaudited statements. Moreover, any knowledge Washington may have had regarding the accuracy of the 1999 financial statements is of little relevance in determining whether Washington had actual knowledge that the statements from the later stub period were inaccurate.

## 2. *Contracts in progress*

Similarly, the plaintiffs argue that the circular was misleading in that REC's unaudited financials for the 2000 stub period indicated "that as of April 2, 2000, REC's 'contracts in process' had a value of $638,881,000." Reply Br. at 6; GSC Br. at 26; App. at 288. To show that Washington knew this statement was misleading, plaintiffs refer us to various documents Washington produced during its due diligence period, in which Washington indicated its belief that several of REC's many contracts were overvalued. *Id.* (citing App. 45-51 (Cplt. ¶¶ 50, 54, 72-76)). Again, in some of these documents, Washington was referring to REC's *unaudited* statements which were later audited before inclusion in the circular and the other documents focused on projects for which Washington was later indemnified.[2] Moreover, there is no

---

[2] Appellees filed a Motion for Leave to File a Supplemental Appendix containing an Ancillary Letter Agreement revealing that Washington was partially indemnified against loss regarding one of REC's projects. Appellants oppose this motion. "We decide on a case-by-case basis whether an appellate record should be supplemented. Even when the added material will not conclusively resolve an issue on appeal, we may allow supplementation in the aid of making an informed decision." *Schwartz v. Million Air, Inc.,* 341 F.3d 1220, 1225 n.4 (11th Cir. 2003). The Ancillary Letter Agreement, while not crucial to the instant decision, helps explain Washington's motive for not discussing its concerns with respect to this particular project in the circular. Therefore, we find that the agreement will aid the Court in making an informed decision. Appellants do not question the validity or authenticity of the agreement nor do they argue that they would be prejudiced in any way by our consideration of the agreement. Appellants do not even argue that they are unfamiliar with the agreement. *See, e.g., Kalimian v. Liberty Mutual Fire Ins. Co.,* 300 F.2d 547, 549

indication that any of Washington's documents referred to the April 2000 stub period or to any other value appearing in the circular, and in none of these documents does Washington provide an estimate of the total value of REC's contracts in progress. For both of these reasons, there is no way to know whether Washington would have disagreed with REC's April valuation at the time the circular was issued.

In any case, Washington made it plain in the circular that REC's accounting for these contracts was aggressive, when it warned that "REC revenue recognition policies are significantly different from those used by MK on certain contracts where significant components are procured in advance of installation. . . . REC's revenue recognition policy on such contracts generally result in more revenue recognition in the early stages of a contract." App. at 126. It also suggested that this difference could be critical when it noted that "[t]he loss of one or more major contracts, or our inability to perform profitably under one or more major contracts . . . could have a material adverse effect on our businesses, financial condition, results of operation and cash flows." App. at 94.

_____

(2d Cir. 1962) ("[T]his court is free to consider facts which have been admitted in argument and in the briefs on appeal . . . ."). To the contrary, appellants argue that the agreement actually supports their case. Reply Br. at 5-6. For these reasons, we grant appellees' motion to file their supplemental appendix.

### 3. *Four projects deviate significantly*

The plaintiffs also take issue with a statement in the circular indicating that four projects for which REC retained liability "deviate significantly and are not representative of other contracts being acquired." Pl. Br. at 29, *quoting* App. at 126. Plaintiffs argue that this statement was misleading because defendants knew "that numerous other projects were also misestimated, likely to incur costly overruns that were uncollectible and were losing money." *Id.* First, a fair reading of this excerpt from the circular is that these four projects deviated significantly because of (a) the extent of loss already incurred on each project; (b) "the reversal of previously-recognized profit"; and (c) "the establishment of reserves for future losses." *Id.*; *In re Burlington*, 114 F.3d at 1426 (noting that if plaintiffs rely on extrinsic documents in their complaint, the documents must be understood in their entirety). Plaintiffs have failed to identify any evidence suggesting that Washington believed that other contracts equally met these three criteria. To the contrary, plaintiffs concede in their complaint that these projects are distinguishable, referring to them as "the four most significant loss projects." App. at 51 (Cplt. ¶ 77). Finally, because Raytheon ultimately retained liability for at least one additional project that plaintiffs allege "deviate[d] significantly," any misleading statements based on that project is immaterial as a matter of law. *See In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1330 (3d Cir. 2002) ("If the disclosure of certain information has no effect on stock prices, it follows

that the information disclosed was immaterial as a matter of law.").

4. *Collection is probable*

The plaintiffs also argue that the circular was misleading in stating that "[u]napproved change orders and claims . . . are included in contracts in process at their estimated realizable value. [REC] has a contractual or legal basis for pursuing recovery of these unapproved change orders and claims and has determined that collection is probable." Pl. Br. at 28 (quoting App. at 277, 293); *see also* Pl. Br. at 7. Plaintiffs suggests that Washington knew this statement was false, because in a March 27, 2000 memorandum it indicated that it believed the recovery percentage for one particular project would be "poor" and that attempted recovery could result in a loss of between $22 and $60 million. App. at 429. It should be noted, however, that the circular refers to a total of $581 million worth of change orders and claims. App. at 276. Therefore, plaintiffs' argument comes down to the fact that Washington actually believed that between 3.8 and 10 percent of these contracts were not recoverable. As far as we know, Washington believed collection was probable for at least 90-96 percent of these change orders. Moreover, far from having *actual knowledge* that between $22 and $60 million of change orders would be uncollectible, the March 27th memorandum suggests a lack of certainty or confidence in Washington's predictions. App. at 428 ("[P]rojects results are difficult to quantify"); *Id.* at 429 ("[I]t is difficult to predict the extent of the loss").

On top of this, the circular statement was qualified through the use of the word "probable" and was accompanied by cautionary language, which indicated that "[t]he settlement of these amounts depends on individual circumstances and negotiations with the counterparty; accordingly, the timing of the collection will vary and approximately $235 million of collections are expected to extend beyond one year." App. at 277. Any reasonable reading of this statement, would make one skeptical about the recovery of the full $235 million. Similarly, as noted *supra*, the circular emphasized that REC took an aggressive approach to revenue recognition. App. at 126. When viewed in this context, we do not believe that the plaintiffs have adequately alleged that any knowing misstatement Washington may have made in print here was material. This is especially true given that Washington was at least partially indemnified by Raytheon for losses associated with the very project discussed in the March 27th memorandum. *See* Supp. App.

In any case, because the statement about collectability is a prediction of the likelihood of collection on change orders and claims, it is a classic forward-looking statement. *See* 15 U.S.C. 78u-5c(4)(I)(1)(A) (defining a forward-looking statement, in part, as "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"); *see also In re Kindred Healthcare, Inc. Sec. Litig.,* No.

02CV-600-H, 2004 WL 77850 at *9 (W.D. Ky. 2004) ("The amount Kindred keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience . . . [which] could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections . . . are forward-looking within the meaning of the PSLRA."); *In re Smith-Gardner Sec. Litig.*, 214 F. Supp. 2d 1291, 1296 (S.D. Fla. 2002) (finding that defendant's statement was protected as forward-looking where "[p]laintiffs . . . allege[d] that Defendants either knew or were severely reckless in disregarding that Smith Gardner would not receive full payment from [a customer], based on the unpaid receivable balance of $1.5 million."). Moreover, we find the accompanying cautionary language to be sufficient in this case. *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 873 (3d Cir. 2000) ("[C]autionary language, if sufficient, renders the alleged omissions or misrepresentations immaterial as a matter of law.") (quoting *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371 (3d Cir. 1993)).[3]

[3] The PSLRA requires forward-looking statements to be accompanied by "meaningful cautionary statements" in order for safe harbor protection to apply. The cautionary language should be "directly related to the alleged misrepresentations," but it does not have to "actually accompany the alleged misrepresentation." *EP Medsystems, Inc.*, 235 F.3d at 874 (referring to the "bespeaks caution" doctrine which, like

Therefore, this statement is protected by the statutory safe-harbor. *See* 15 U.S.C. 78u-5c.

5. *Goodwill*

Plaintiffs also raise the statement in the circular that: "[a]djustments to the purchase price . . . are expected to have no effect on goodwill." Pl. Br. at 28; App. at 111. Plaintiffs argue that this statement is false because "[d]efendants already knew that the true value of REC was significantly lower than the purchase price, which would require further allocation of goodwill." *Id*. Regardless of this alleged knowledge, however, the circular statement would only be false or misleading if Washington knew at the time

the safe harbor provision, protects forward-looking statements that are accompanied by meaningful cautionary statements from liability). Cautionary language must be "extensive and specific." *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000) (quoting *In re Trump*, 7 F.3d at 369. This Court in *In re Trump* explained: "[A] vague or blanket (boilerplate) disclaimer which merely warns the reader that the investment has risks will ordinarily be inadequate to prevent misinformation. To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id*. at 182 (quoting *In re Trump*, 7 F.3d at 371-72).

it made the statement (a) that it *was* going to make adjustments to the purchase price in the future and (b) that those adjustments would *not* track the value of REC. Plaintiffs have neither alleged nor have they presented any evidence of such knowledge. Moreover, none of the documents relied upon by plaintiffs suggests that Washington even had actual knowledge that additional goodwill would ultimately have to be recorded.[4] The mere fact that the amount of additional goodwill that later had to be recorded was substantial is not enough, on its own, to infer either actual knowledge or recklessness. *See Kushner v. Beverly Enters.*, 317 F.3d 820, 829 (8th Cir. 2003). Additionally, this is another forward-looking statement accompanied by meaningful cautionary language, and is therefore protected by the statutory safe-harbor. *See, e.g.,* App. at 93 (warning that acquisitions "may involve risk of undisclosed liabilities").

### 6. *Undiscovered liabilities*

The plaintiffs argue that the circular was misleading in stating that "[t]here may be liabilities of acquired companies, including REC, that we fail or are unable to discover during our due diligence investigation" because as plaintiffs allege,

"[d]efendants had already discovered significant additional liabilities." Pl. Br. at 28-29; App. at 93. This argument is frivolous. First, this statement in the circular is included in a long discussion of risks associated with the company, and in that context, it is true and not misleading. Moreover, none of the documents upon which the plaintiffs rely suggests that Washington had actual knowledge that there were significant additional liabilities which were not already reflected in the circular, or for which Washington had not been indemnified. App. at 93 (noting in the circular that Washington "generally seek[s] to minimize the impact of . . . liabilities by obtaining indemnities and warranties from the seller.")

### 7. *Due diligence*

Finally, plaintiffs raise various omissions which fall within two categories. First, plaintiffs allege that Washington failed to disclose that its due diligence had been obstructed. While it is clear that REC initially obstructed Washington's due diligence, it seems that by the issuance of the circular, Washington believed, perhaps mistakenly, that it had been given adequate access. *See, e.g.,* Due Diligence Memorandum of April 3, 2000, App. at 653 (noting that "[i]n most cases the first visits were not conclusive because site performance information was restricted. The recent update visits were more informative."). Although we do not mean to suggest approval of the practice, we note that it is not uncommon for a target to be somewhat uncooperative with respect to due diligence requests from a potential acquirer. *See, e.g.,* Larry

---

[4] Similarly, none of the documents relied upon by plaintiffs suggest that Washington had actual knowledge contradicting its statement that "[t]he acquisition of REC will double [Washington's] size in terms of revenues and backlog." Pl. Br. at 27; App. at 117.

Schnapf, *Cost Effective Due Diligence In Corporate Mergers and Acquisitions*, 15 Nat. Resources & Env't 80 at 83 (2000) (noting that even in a friendly takeover, the target company may be reluctant to share information that may cause a party to back out of a deal, renegotiate the price or that may end up having repercussions if the transaction collapses). Often this tendency towards secrecy relates to a concern, that if the deal falls through, the acquirer might use the target's secrets to better compete with it, or that the target will be otherwise disadvantaged. *Id.* In such situations, as here, the target will often become more cooperative and candid the closer the deal gets to becoming a reality. We see no evidence in this case, however, that Washington believed its due diligence had been *materially* obstructed at the time of the circular, nor do we believe that Washington would have gone through with this acquisition had it believed this to be the case.[5] There is simply nothing to suggest that Washington was on a suicide mission in this acquisition.

### 8. *Poor financial accounting*

Plaintiffs allege that Washington "knew, but did not disclose, that Raytheon and REC had poor financial accounting, which necessarily entailed that the

---

[5] In fact, we doubt that we would be able to uncover any offering circular which cautioned that due diligence had been *materially* obstructed by the target and that this issue was still unresolved, given that it seems unlikely that any acquirer would proceed with an acquisition under such circumstances.

unaudited financial statements for the first quarter of 2000 should not be relied on." Reply Br. at 7. First, we reiterate our earlier finding that plaintiffs have presented no evidence that Washington had actual knowledge that the unaudited financial statements for the 2000 stub period were unreliable. The plaintiffs' argument appears to be, however, that Washington was reckless in disclosing REC's unaudited financial statements knowing that its earlier unaudited statements evidenced poor accounting. This argument is not without some support.

In *In re Lucent Tech., Inc. Sec. Litig.*, 217 F. Supp. 2d 529 (D.N.J. 2002), the court found recklessness under similar circumstances. In *Lucent*, plaintiffs argued that "Lucent management was already aware that revenues had been inflated in previous quarters, and that they learned of these earlier accounting improprieties, at the latest, during the third quarter." *Id.* at 554 (citations omitted). As here, plaintiffs in *Lucent* claimed that "Defendants would have been at least reckless in reporting financial results for the third quarter without first determining whether those results were also inflated." *Id.* The district court agreed, finding that "[i]f Defendants were aware that accounting manipulations occurred during the first two quarters of 2000, then, conceivably, they may have been reckless in blindly reporting results for the following quarter, and proof of recklessness is enough." *Id.*

While such a scenario may very well constitute recklessness under the facts of *Lucent*, we do not believe that

Washington's conduct here rises to the "extreme departure from the standards of ordinary care" which is required for a finding of recklessness. *In re Advanta*, 180 F.3d at 535 (quoting *McLean*, 599 F.2d at 1197). First, the circular contained *both* audited and unaudited financial statements for some overlapping periods as well as for periods closely linked in time. *See, e.g.,* App. at 126, 288. Therefore, to the extent that the unaudited statements were out of line with the audited statements, this deviation could be deduced from the circular itself, obviating the need for a special note.

Second, as noted earlier, Washington disclosed in the circular that REC's accounting was aggressive. App. at 126. This would give any reasonable investor pause before relying on REC's unaudited statements. Third, plaintiffs have shown at most that Washington believed REC had "poor" accounting practices. App. at 554 (March 14, 2000 presentation) (noting that REC had "[p]oor financial controls/accounting practices"). In contrast, in *Lucent*, plaintiffs alleged that before it reported its earnings for the fourth quarter, Lucent already knew that it "had improperly booked hundreds of millions of dollars of revenue on sales to customers in situations where customers had not ordered products"—clearly a more egregious allegation. *In re Lucent Tech.*, 217 F. Supp. 2d at 538. Finally, in *Lucent*, the alleged manipulations were in the company's own balance sheet, rather than on the balance sheet of the company to be acquired, as in this case. Therefore, unlike Lucent, Washington realistically could not have revised REC's financial statements or

substituted different financial statements. At most, it could have included an additional cautionary note. While the inclusion of such a note may have been a good idea, we do not believe its omission rises to the level of recklessness required under the PSLRA.

In conclusion, plaintiffs have failed to plead with particularity the required element of scienter, either by demonstrating motive and opportunity, conscious misbehavior or recklessness. Therefore, the district court properly granted Washington's motion to dismiss.

C.      *Credit Suisse First Boston*

The plaintiffs allege that CSFB conducted its own due diligence, had access to Washington's due diligence and communicated with Washington about due diligence findings. They further allege that, because CSFB had access to and shared information with Washington, CSFB "knew and/or recklessly disregarded all of the information known by Washington Group and the other Defendants." App. at 43, 53 (Cplt. ¶¶ 43, 85). This a bare bones allegation, and the plaintiffs fail to specify which statements CSFB knew were false or misleading. Furthermore, as noted *supra*, an allegation that CSFB "must have known," because of its relationship with Washington, that a statement was false or misleading, is insufficient to raise a "strong inference" that CSFB acted recklessly or with conscious misbehavior. *See In re Advanta*, 180 F.3d at 539. The plaintiffs cannot satisfy the scienter requirement by grouping CSFB with the Washington

defendants. *Oran*, 226 F.3d at 290; *In re Advanta*, 180 F.3d at 539 ("Generalized imputations of knowledge do not suffice . . ."). Regardless, since the plaintiffs have failed to show scienter with respect even to Washington, the plaintiffs certainly cannot establish scienter with respect to CSFB, since the plaintiffs have made no allegation unique to CSFB.

Finally, the plaintiffs have failed to attribute any false statement or omission to CSFB. The plaintiffs rely on *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 94 F. Supp. 2d 491 (S.D.N.Y. 2000), for their argument that CSFB can be held liable as an initial purchaser for a Rule 10b-5 violation. The district court correctly noted that *Gabriel* is distinguishable on its facts. In *Gabriel*, the plaintiffs alleged that the defendants, in addition to being the initial purchasers, also drafted the offering memorandum as well as distributed it during sales pitches. *Id.* at 502. The plaintiffs here do not allege that CSFB drafted or distributed the circular. Therefore, the holding of *Gabriel* is not applicable here.[6]

---

[6] *Gabriel* is distinguishable for another reason. In *Gabriel*, the disclaimer in the offering memorandum stated only that the initial purchasers made "no warranty" as to the statements contained therein. *Id.* Here, in contrast, the offering circular states that the initial purchasers made "no representations" at all. App. at 74 ("No representations or warranty, express or implied, is made by the initial purchasers as to the accuracy or completeness of the information contained in this offering circular. Nothing contained in this offering

D. *Dismissal with prejudice*

The plaintiffs ask that the case be remanded with instructions to allow them to replead, yet they "do not specify what additional facts, if any, they would plead if given another opportunity to amend their Complaint." *In re NAHC*, 306 F.3d at 1332 (holding that amendment of the complaint would be futile). One of Congress' objectives in enacting the PSLRA was "'to provide a filter at the earliest stage (the pleading stage) to screen out lawsuits that have no factual basis." *Id.* (quoting *In re Champion Enters., Inc., Sec. Litig.*, 145 F. Supp. 2d 871, 874 (E.D. Mich. 2001). This objective would be frustrated where "there is a stark absence of any suggestion by the plaintiffs that they have developed any facts since the action was commenced which would, if true, cure the defects in the pleadings under the heightened requirements of the PSLRA." *Id.* at 1333. Because the plaintiffs have offered no additional facts that would cure their amended complaint, we decline the plaintiffs' request for permission to replead and for the foregoing reasons, we affirm the district court's grant of defendants' motion to dismiss.

---

circular is, or shall be relied upon as, a promise or representation by the initial purchasers.") While this subtle difference in language is hardly dispositive, it adds to our conclusion that *Gabriel* does not apply and that CSFB did not make any actionable statement.